## MUTUAL BENEFIT LIFE INS. CO. v. HEROLD,
### Internal Revenue Collector.

(District Court, D. New Jersey. July 29, 1912.)

**1.** INTERNAL REVENUE (§ 4*)—EXCISE TAX—STATUTES—CONSTRUCTION.

Corporation Tax Act (Act Cong. Aug. 5, 1909, c. 6, 36 Stat. 112 [U. S. Comp. St. Supp. 1911, p. 946]) § 38, imposing a special excise tax on corporations, is within the rule that a statute providing for the imposition of taxes shall be strictly construed, and that all reasonable doubts in respect thereto shall be resolved against the government and in favor of the citizen.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 4, 5; Dec. Dig. § 4.*]

**2.** INTERNAL REVENUE (§ 9*)—CORPORATION TAX—MUTUAL INSURANCE COMPANY—PREMIUM "DIVIDEND."

Corporation Tax Act (Act Cong. Aug. 5, 1909, c. 6, 36 Stat. 112 [U. S. Comp. St. Supp. 1911, p. 946]) § 38, imposes an excise tax on insurance companies equivalent to 1 per cent. on the entire net income above $5,000 received by it from all sources during the year, exclusive of amounts received by it as dividends on stock of other corporations, etc., subject to the tax, such income to be ascertained by deducting all losses sustained and not compensated by insurance or otherwise, including a reasonable allowance for depreciation and sums other than dividends paid within the year on policy and annuity contracts, and the net addition, if any, required by law to be made within the year to reserve funds. *Held*, that the word "dividends" was used in such act in its popular sense as representing profits, and that so-called dividends of a mutual company doing business on the level premium plan, consisting merely of the portion of the loading of the premium charged in excess of the cost of insurance and returned annually to the policy holders after the first year, so far as the same were used to reduce subsequent premiums, were not "income * * * received," and were, therefore, not subject to taxation. Such rule, however, does not apply to a "dividend" declared in the case of a full-paid participating policy, wherein the policy holder has no further premium payments to make, which dividend constitutes a participation in the profits and income of the invested funds of the company.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, vol. 3, pp. 2143–2147.]

**3.** INTERNAL REVENUE (§ 9*)—CORPORATION TAX—INSURANCE COMPANIES—INCOME RECEIVED—RESERVE—SUPPLEMENTARY POLICY CONTRACTS.

Where a mutual insurance company issued supplementary policy contracts, by which the amount due on policies that had matured was paid in annual installments for a given term of years, or during the lifetime of the beneficiary, instead of in one sum, and, to secure such payments, was required by state law to maintain a reserve, it was entitled to deduct such reserve from its income received in determining the amount on which it was liable for excise taxation under Corporation Tax Act (Act Cong. Aug. 5, 1909, c. 6, 36 Stat. 112 [U. S. Comp. St. Supp. 1911, p. 946]) § 38, providing for deduction of the net addition, if any, required by law to be made within the year to reserve funds.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*]

**4.** INTERNAL REVENUE (§ 9*)—CORPORATION TAX—INSURANCE COMPANIES—"INCOME"—CASH OR REVENUE BASIS.

Corporation Tax Act (Act Cong. Aug. 5, 1909, c. 6, 36 Stat. 112 [U. S. Comp. St. Supp. 1911, p. 946]) § 38, imposes an excise tax on the net in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

come received during the year by insurance companies, to be ascertained by deducting from the gross income all ordinary and necessary expenses actually paid within the year in the maintenance and operation of the business, all losses actually sustained within the year and also all sums other than dividends paid within the year on policy and annuity contracts, interest actually paid within the year on bonded indebtedness, all sums paid by it within the year for taxes, and all sums received by it within the year as dividends on stock of other corporations, etc. *Held*, that the word "income," as used in such act, meant that which had "come in" or had been already received, and that the net income so taxable should be determined on a cash, as distinguished from a revenue, basis, and did not include uncollected and deferred premiums and interests, accrued and due, but not actually received.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, vol. 4, pp. 3501–3507; vol. 8, p. 7685.]

5. INTERNAL REVENUE (§ 9*)—CORPORATION TAX—OFFICE FURNITURE AND EQUIPMENT—RENEWAL—DEDUCTION.

An ordinary expenditure by a mutual life insurance company for renewal of office furniture and equipment did not constitute assets, but was rather an expense of maintenance and operation, which it was entitled to deduct in determining the net income on which it was taxable, under Corporation Tax Act (Act Cong. Aug. 5, 1909, c. 6, 36 Stat. 112 [U. S. Comp. St. 1911, p. 946]) § 38, authorizing the deduction of a reasonable allowance for depreciation of property, if any.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*]

At Law. Action by the Mutual Benefit Life Insurance Company against Herman C. H. Herold, Collector of Internal Revenue, to recover certain alleged internal revenue corporation taxes imposed on plaintiff and paid under duress. Judgment for plaintiff.

John O. H. Pitney, John R. Hardin, and David Kay, Jr., for plaintiff.

John B. Vreeland, U. S. Dist. Atty., and H. P. Lindabury, Asst. U. S. Dist. Atty., for defendant.

CROSS, District Judge. This action was instituted in the Supreme Court of this state, and removed by certiorari to this court, where the same was tried without the intervention of a jury, which was waived pursuant to the statute. Testimony in the case having been taken, counsel for the respective parties agreed upon a statement of facts, which they requested the court to find in the nature of a special verdict, and direct the same to be entered of record as such, with which request the court has complied.

The plaintiff seeks to recover from the defendant certain taxes which it alleges were illegally assessed against it, under and by virtue of the provision of the act of Congress entitled "An act to provide revenue, equalize duties and encourage the industries of the United States, and for other purposes," approved August 5, 1909 (36 Stat. 112, c. 6, § 38 [U. S. Comp. St. Supp. 1911, p. 946]), which taxes so assessed amount to $61,853.98. The statement of facts admits that the taxes were paid under protest and duress, and that the plaintiff

has complied with all of the prerequisites necessary to entitle it to recover so much of said taxes as it may be adjudged herein were erroneously or wrongfully assessed and collected. The plaintiff was incorporated by a charter granted by the state of New Jersey in 1845 (P. L. 1845, p. 25) for the insurance of life risks. It is a mutual company, without capital stock or stockholders. Its policy holders are its only members, and they select its directors from their own number. Its business is conducted on the mutual level premium plan.

Pursuant to section 38 of the act of Congress above referred to, the plaintiff duly filed the return thereby required for the years 1909 and 1910, showing the gross income received by it during those years, respectively, and other matters required by that act, and the excise tax assessed thereon against the plaintiff for those years was duly paid. Subsequently, and in the year 1911, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, amended the return for the years above mentioned, and levied an additional assessment against the plaintiff for the year 1909 of $26,789.83, and for the year 1910 an additional assessment of $35,064.15, which sums the plaintiff alleges were illegally assessed and seeks to recover by this action.

The portions of section 38 of the act above referred to especially applicable to this case may be found in paragraphs 1 and 2. Paragraph 1 provides that:

" * * * Every insurance company now or hereafter organized under the laws of the United States, or of any state or territory of the United States, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such * * * insurance company, equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations, joint stock companies or associations, or insurance companies, subject to the tax hereby imposed. * * * "

And paragraph 2 provides that:

"Such net income shall be ascertained by deducting from the gross amount of the income of such * * * insurance company received within the year from all sources (first) all the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties, including all charges such as rentals or franchise payments, required to be made as a condition to the continued use or possession of property; (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any, and in the case of insurance companies the sums other than dividends, paid within the year on policy and annuity contracts and the net addition, if any, required by law to be made within the year to reserve funds; * * * (third) interest actually paid within the year on its bonded or other indebtedness, etc.; * * * (fourth) all sums paid by it within the year for taxes," etc.; * * * (fifth) all amounts received by it within the year as dividends upon stock of other corporations, joint stock companies, or associations, or insurance companies, subject to the tax hereby imposed. * * * "

[1] At the outset it may be remarked that a statute providing for the imposition of taxes is to be strictly construed, and all reasonable doubts in respect thereto resolved against the government and in

favor of the citizen. This principle is so well established that the citation of any considerable number of authorities in its support is unnecessary. In Spreckels Sugar Co. v. McClain, Collector, etc., 192 U. S. 397, 416, 24 Sup. Ct. 376, 382 (48 L. Ed. 496), Mr. Justice Harlan quoted with approval the following language of Judge Gray:

"Keeping in mind the well-settled rule that the citizen is exempt from taxation, unless the same is imposed by clear and unequivocal language, and that, where the construction of a tax is doubtful, the doubt is to be resolved in favor of those upon whom the tax is sought to be laid."

In Benziger v. United States, 192 U. S. 38, 24 Sup. Ct. 189, 48 L. Ed. 331, it was held, with reference to a classification under the tariff act, that the provision of the statute—

"should be liberally construed in favor of the importer, and, if there were any fair doubt as to the true construction of the provision in question, the court should resolve the doubt in his favor."

That case cited with approval American Net & Twine Co. v. Worthington, 141 U. S. 468, 12 Sup. Ct. 55, 35 L. Ed. 821, and United States v. Wigglesworth, 2 Story, 369, Fed. Cas. No. 16,690, in which latter case it was held that:

"It is * *. * a general rule, in the interpretation of all statutes levying taxes or duties upon subjects or citizens, not to extend their provisions by implication beyond the clear import of the language used, or to enlarge their operation so as to embrace matters not specifically pointed out, although standing upon a close analogy. In every case, therefore, of doubt, such statutes. are construed most strongly against the government, and in favor of the subjects or citizens, because burdens are not to be imposed, nor presumed to be imposed, beyond what the statutes expressly and clearly import."

Four points have been raised and argued by counsel: First, whether certain so-called dividends are or are not "income * * * received" within the meaning of the statute; second, whether certain so-called "supplementary policy contracts" should be represented in the reserve funds; third, whether for the purpose of taxation the corporation's statement should be made on a "cash" or on a "revenue" basis; and lastly, whether expenditures for replacing furniture, etc., should be considered as an investment or an expense.

[2] These questions, of which the first is the most important, will be considered in the order named. Before proceeding, however, to determine whether "income * * * received" includes, not only cash receipts, but also deductions from renewal premiums allowed on account of overpayments of previous years, it seems both advisable and necessary to quote at some length from the statement of facts: Paragraph 4 thereof, after describing the three methods employed in mutual life insurance of securing from members, contributions to meet losses, proceeds as follows:

"The level premium plan is the one in general use by all insurance companies, including plaintiff. Under this plan the maximum annual contribution which any member can be called upon to pay is uniform throughout the life of the policy. The member pays during his early years a sum in excess of the current cost of his insurance. This excess is applied to the creation of a reserve or self-insurance fund, which serves to maintain the insurance

in the later years, when the stipulated level premium would be insufficient to meet the current cost of insurance on the mutual premium plan.

"Whether a mutual company be conducted on the assessment plan, the natural premium plan, or the level premium plan, the member receives his insurance at cost. The assessment company collects its premiums after the death has actually occurred and the cost is thereby ascertained. The mutual level premium company collects its estimated premiums in advance and adjusts the actual cost afterwards.

"The calculation of premium rates for life insurance involves, first, the adoption of a table of mortality, showing the probable death rate for each age of life; second, the adoption of an assumed rate of interest such as the company may safely expect to realize upon its invested assets during the lifetime of the policy. These two factors determine what is technically known as the net or mathematical premiums, which are the sums sufficient and necessary to pay all outstanding policies as they become claims, provided deaths occur exactly in accordance with the table of mortality and the rate of interest earned on the investment of such premiums is exactly equal to the rate assumed. To the net or mathematical premiums there is added a sum, technically known as 'loading,' for the purpose of meeting the expense of conducting the business, as well as any unforeseen contingencies, such as an abnormal death rate due to war or pestilence. The net or mathematical premium, increased by the 'loading,' constitutes the premium rates stipulated in the policies of insurance.

"Premium rates so computed are, in the experience of life insurance companies, generally found to be in excess of their requirements. In a mutual company such excess constitutes its margin of safety and must be liberal. Such a company has no capital stock and must rely entirely upon its premiums to meet unusual contingencies. They must be sufficiently large to assure the company's ability to pay its claims as they accrue beyond peradventure. Their policies may run for a period of 50 or even 75 years, and the stipulated premium cannot be increased after the policy is issued. In computing their rates the companies use, therefore, a table of mortality showing an admittedly higher death rate than that which will probably be realized. The assumed rate of interest on investments is also lower than that which the company expects to realize. The provision for expenses and contingencies is greater than would ordinarily be required. Mutual companies have these three margins of safety, and, normally, each assumption is in excess of what is actually required. They result in excess or redundant premiums.

"According to the practice of the plaintiff, at the end of each year the excess of income over disbursements is ascertained, and, after setting aside so much of said excess as is required for the increase in policy reserves and other liabilities, the balance is added to the dividend fund. Each policy holder's share in this fund is then ascertained, and before his next premium falls due he is advised of the amount thereof and that the company will accept in full settlement of such premium the difference between the premium written in his policy and the amount standing to his credit in the dividend fund, which has arisen out of previous premium payments. The policy holder may, if he desires, withdraw his share of the dividend fund in cash; or this share is paid to him if he discontinues his policy, or is paid in addition to the amount insured if the policy becomes a death claim. The fund is available for emergencies; but unless so used by the company it is not depleted from year to year, except by such actual cash payments as are made from it as above mentioned.

"The method of calculating premiums and ascertaining and disposing of the excess described in this and the two preceding paragraphs is practiced, not only by the plaintiff, but by other mutual life insurance companies generally.

"Plaintiff permits the policy holder to pay the full stipulated premium, instead of the difference between the stipulated premium and the amount standing to his credit in the dividend fund. In such cases the difference between the amount so paid and the sum required to continue the policy in force is used by the plaintiff, either in the purchase of additional insurance

or to shorten the endowment or premium-paying period, as the insured elects. * * * "

From the foregoing it appears that where, as in a mutual company, insurance is effected at cost, it is essential, in order to constitute a margin of safety, that its premium rates should be larger than it might, reasonably be expected would be required to carry the insurance. To effect this purpose a table of mortality is used which shows an admittedly higher death rate than that which will probably prevail, while the assumed rate of interest on its investments is made lower than it is expected will be realized, and the provision for contingencies and expenses is made greater than would ordinarily be necessary. This course is adopted for the reason that a mutual company, having no capital stock, is compelled to rely upon its premiums to meet unexpected losses and contingencies. Paragraph 7 of the statement of facts shows clearly how the dividend fund is created. Each policy holder may, at his option, withdraw his dividend—that is, his share of such fund—in cash, or have it applied in reduction of the subsequent year's premium, or to purchase additional insurance, or to accelerate the payment period. Such option is conferred by the following or a similar clause which appears in all of the outstanding policies of the company:

"After this policy shall have been in force one year, each year's premium subsequently paid shall be subject to reduction by such dividend as may be apportioned by the directors. Dividends thus created will be applied either in reduction of premium or upon the addition or accelerative endowment plan, or paid in cash at the option of the insured."

The policy holder, therefore, although he has paid more at the beginning of the year than was necessary to provide for the cost of carrying his insurance, will nevertheless, at the end of the year, when such cost has been actually ascertained, receive the benefit of the overcharge by way of a so-called dividend. Thus the policy holder receives his insurance at cost, while at the same time the stability and solvency of the company have been reasonably and properly guarded and maintained. In all cases where the policy holders, in the exercise of their options during the years 1909 and 1910, in question, withdrew their dividends in cash, the amount thereof was included in the plaintiff's statement, and the tax thereon imposed by the government was paid. The government claims, however, that where the dividends to the policy holders are not withdrawn in cash, but, pursuant to the option allowed them, have been applied in one or other of the ways above mentioned, they are to be regarded as cash dividends paid by the company upon which the government is entitled to impose, as it did impose, the tax in question.

The true situation, however, is this: The policy is issued at a fixed premium, as determined by the company's table of rates. That stipulated premium cannot be increased, but may be lessened annually by so much as the experience of the preceding year has determined it to have been greater than the cost of carrying the insurance, and the difference between the amount of the stipulated premium and the cost of carrying the risk constitutes the so-called dividend. This dif-

ference, however, is not in any real sense a dividend. The term as used is technical and well understood in insurance circles, and as so understood has a widely different signification from that ordinarily attached to the word "dividend." It operates, as already stated, merely to abate or reduce the stipulated premium called for by the contract of insurance, to the extent and for the reason that it has been determined by experience that the policy holder paid for his insurance during the preceding year more than it actually cost the company to carry the risk. This excess payment represents, not profits or receipts, but an overpayment—an overpayment because, being entitled to his insurance at cost and having paid more than it cost, he is equitably entitled to have such excess applied for his benefit. It makes no difference what this excess is called. The question is, What does it represent? Does it in any wise or to any extent represent earnings or profits received by the company, so as to constitute it a part of its income; or does it merely represent an overpayment?

Under the terms of his policy, the policy holder may at his option withdraw such excess in cash, and thereby impart to it a quasi appearance of profits; but its character is not thereby changed. In that case, however, he would, if he desired to continue his policy, be required to pay the full premium as therein stipulated; whereas, if he desired such premium reduced to what experience had shown was the actual cost of his insurance, he could have the excess over such cost applied in reduction of the stipulated premium and pay only the cost price for the ensuing year; and, assuming that the cost price as determined by the experience of the first year remained the same for 5, 10, 15, or other number of years, that original excess payment would serve to carry his insurance at cost during all of the succeeding years. The following extract from the brief of counsel for the complainant fully and clearly illustrates the point:

"It appears that if the company issues a policy with a premium of say $100, and it is found at the end of the year that the payment of that sum at the beginning of the year was $10 in excess of the actual cost of the insurance, the company holds this amount in a 'dividend' fund, and collects from the policy holder, in full settlement of the second year's premium, $90. At the end of the second year it might be found that this payment of $90 was $2 in excess of the cost of the insurance during the second year, so that the company would hold $12 which had been paid in excess of the cost of the first and second years' insurance. The insured would then pay $88 as a premium for the third year. If during the third year the death rate among the company's members should increase abnormally, so that the company would be required to use $4 of the $12 standing to the policy holder's credit in the dividend fund, leaving $8 therein, it would be necessary for the insured to pay $92 in settlement of the premium for the fourth year's insurance. The amounts returned for taxation would be $100 the first year, $90 the second year, $88 the third year, and $92 the fourth year. Instead of paying $92 the fourth year, the policy holder might pay $100, and in this case $92 would be applied to continue the original policy in force and $8 would be used to buy additional insurance, or to shorten the premium-paying term, in which case $100 would be returned for taxation. The several amounts of $10, $12 and $8 represent the so-called dividends or amounts standing to the credit of the policy holder in the dividend fund, which, unless withdrawn in cash by the policy holder, are paid by the company, in addition to the amount insured, when the policy becomes payable as a claim."

From the foregoing it appears that what the company receives in cash, and all that it so receives where the dividend is applied in abatement of renewal premiums, is the difference between the stipulated premium and the so-called dividend. In such cases the dividends are not sums paid to the policy holder and by him returned in cash. They are not "income * * * received." The policy holder has not paid the premium stipulated in his policy, but a premium reduced by his share of a fund, as ascertained by the directors, composed of excess premiums. This seems to be the view which has been uniformly taken by the courts, in so far as their decisions have been brought to my attention. In Mutual Benefit Life Insurance Co. v. Commonwealth, 128 Ky. 374, 107 S. W. 802, the Supreme Court of that state so held, as will appear from the following extract taken from a somewhat lengthy opinion:

"It is clearly shown by the evidence, and conceded by counsel for the state, that the reports as made by the appellant company embrace all first, or original, premiums, the premiums receipted for on the face of the policies, and also the subsequent, or renewal, premiums, except to the extent that such renewal premiums were reduced by what is termed 'dividends.' It is the contention of the appellee that such renewal premiums should have been reported, without such reduction or abatement, as having been received by the company 'in cash or otherwise'; while the appellant company contends that the reduction from the nominal, or stated, premium as made was a contract right of the policy holder, and constituted no premium or part of the premium received by the company 'in cash or otherwise.' And these opposing contentions present the question in this case. * * *

"The present statute reads: '* * * All premiums receipted for on the face of the policy for original insurance and all renewal premiums received in cash or otherwise in this state or out of this state on business done in this state during the year ending the 30th day of June last preceding. * * *' The appellant, every year before a premium falls due, determines how much of the stipulated premium it will exact from the insured. The diminution, whether it be called a 'dividend' or 'surplus,' goes in the abatement of the renewal premium, and the insured pays only the difference. The insurance company, therefore, received, not the full renewal premium, but the difference between the stipulated premium and this dividend or portion of surplus. All that the insurance company receives in cash or otherwise is this difference. * * *

"The commonwealth is claiming to tax the appellant upon money which it never received at all. The appellant says that it is only required to pay upon money which it receives in cash or otherwise, except that it admits that it is bound to pay the full tax on the original premium receipted for on the face of the policy, without regard to whether it in fact received such premium or not. The answer sets out the course of business of the appellant, and shows what money it has received and what money it has not received, and shows that the difference between it and the commonwealth is that the commonwealth is attempting to charge it for the full amount of premiums stipulated for in the face of the policy, although it does not exact, and has not the right to exact, such full amount, being required to give to the policy holder the advantage of the dividend or surplus, or whatever it may be called, in the diminution of the nominal premium. * * *

"Now, the truth is that this overpayment (called 'dividend') is not a dividend in any sense of the term; nor is the failure of the company to collect the full amount of the premium in after years a credit in any sense of the term. A sum of money applied as a credit can never be used for the same purpose again. If I owe A. $50, and he owes me five notes of $150 each, when I credit him on the first note with the $50 I owe him, he cannot require me to credit the same sum on the remaining four notes as they fall due. But that is just what the state is insisting on being done in this case. The

policy holder makes the overpayment of premium technically called 'loading,' and the company holds this sum and calls it a 'dividend,' and the state says that this is a crediting of the same sum on each of the after-accruing premiums, and should be considered as so much collected each year by the company, and as having been paid 'otherwise' than as cash.

"In order to bring the matter before our minds distinctly, let us assume that in 1900 A. takes out a policy in the appellant company in which the stipulated premium is $150 per annum, that of this sum $100 would be sufficient to carry the risk in ordinary times, and that $50 is what is called 'loading,' collected in order to meet the contingencies of the future. ,Now, in 1900 the policy holder pays the full amount of the premium, $150. After that the company says to him, 'You need only pay $100 per annum; and, as long as the $50 of overpayment you made in 1900 remains unexhausted, your annual premiums will be really $100, instead of $150, as stated in the policy.' The account in five years would be stated as follows:

| | | |
|---|---|---|
| 1900, | beginning of the insurance period, premium paid | $150 00 |
| 1901, | premium paid | 100 00 |
| 1902, | premium paid | 100 00 |
| 1903, | premium paid | 100 00 |
| 1904, | premium paid | 100 00 |
| 1905, | premium paid | 100 00 |
| | Total | $650 00 |

"Obviously the total amount of money paid by the policy holder and received by the insurance company is $650, and it has received no more, either in cash or otherwise; and on the sum so received it is conceded that appellant has paid the tax due. If we look only at the method of bookkeeping of the appellant and have regard only to the terms it uses, there is much in the appearance of the case thus presented to warrant the position of the commonwealth as to its right to tax the so-called 'dividends' said to be annually credited on the premiums due from policy holders; but the law looks below the mere appearance of things, and has regard to the reality, and, thus looking, it sees that the appellant misuses the terms 'dividend' and 'credit,' and, as shown above, pays no dividend and allows no credit, but that, in reality, all that it does is to collect on the first premium a sum sufficient to meet the contingencies of any given year of the future, and then abstains from collecting any further overpayment while the first remains on hand."

The opinion in the foregoing case has incorporated in it, somewhat at length, an opinion by the Appellate Branch of the Court of Common Pleas of Pennsylvania, in Commonwealth v. Penn Mutual Life Insurance Co., 1 Dauph. Co. Rep. 233, from which the following extracts have been taken:

"But we think the so-called 'dividends to policy holders' are not 'net earnings or income,' and do not represent such earnings, and that defendant is not liable to tax in respect to them. Notwithstanding the ·mass of testimony and exhibits on this point, including the ingenious questions of the able counsel on either side, followed by answers from the officers of the company, called as witnesses, not always as clear or intelligent as might have been expected, the facts are few and simple, as we have found them above. It is strenuously contended by the able special counsel for the commonwealth that, because these abatements are entered on the books of the company as 'divi dends to policy holders' or 'surplus to policy holders,' they therefore represent net earnings or income, and furnish a measure of the liability of the company to taxation. Whatever these statements may be called, they are in reality what we have stated in the finding of facts. The amounts they represent are mere negative quantities, abstract statements, not of what is, or is to be, received or to 'come in,' but what is not to be received. The calculations are made for the express purpose of determining how much of the

amount which the company might receive shall not be received, and one of the items which make up the apparent amount upon the basis of which this calculation is made is the sum which was abated and not received during the preceding year. In short, the whole proceeding is merely a method by which the books of the company are made to show what would be the actual gross debtor and creditor accounts of the company, if the whole amount of the premiums was collected and a part was afterwards returned to the policy holders, while in fact it is neither collected nor returned. * * * It is a fallacy to suppose that the real nature of the transaction is that the policy holder pays his whole stipulated premium and receives his share of the dividend or distribution of surplus."

In State of Minnesota v. Mutual Benefit Life Insurance Co., decided December 15, 1909, in the district court of the Second judicial district of that state (opinion not reported), it appears that a state statute required insurance companies to pay annually a tax equal to 2 per cent. of all premiums received by them or their agents in that state, in cash or otherwise, during the preceding calendar year. The claim was there made by the state that the defendant company should pay—

"the tax on an amount represented by the maximum premiums called for in the policy, covering not only the amount the policy holder pays each year in cash, but also including any amount the policy holder receives credit for on such premium in the form of a dividend. In short, the state claims the insurance company in effect receives the maximum premium in cash in this state in such year, although but part is paid by the insured in cash and the balance is in the form of a credit given by the company on account of a dividend allowed."

In disallowing the state's claim, the court in its opinion says:

"The dividend declared in any year is applied in reduction of the next maturing premium on the policy of the insured. It follows that, where a dividend has been apportioned and applied to the reduction of the premium named in the contract, the policy holder pays to the company and the latter receives in cash only the difference between the maximum premium and the amount of the dividend, and these dividends, as the facts disclose, represent a surplus arising out of premiums previously paid, upon which the defendant company has already paid the state its two per cent. tax. The word 'premium,' as used in this statute, is subject to the limitations expressed in the words which follow and in a measure control its use, to wit: 'Received in this state in cash or other obligations.'

"The statute apparently does not require the company to pay the 2 per cent. tax on the full amount of premium named in its policies in this state. If so, the law would have so stated. On the contrary, the language is 'two per cent. on all premiums received in cash and other obligations in this state.'"

In Fuller v. Metropolitan Life Ins. Co. of New York, 70 Conn. 647, 41 Atl. 4, the court said:

"It [net premium] is the sum paid yearly by each to furnish the stipulated protection for all. But the policy holders must pay, not only for the cost of insurance, but also for the expense of management; so to the net premium is added a sum deemed sufficient to pay expenses and provide for contingencies, which is called the 'loading.' In this way the policy holders pay the sum necessary for the cost of insurance and expense of management. The amount of the net premium is calculated upon the basis of certain tables of mortality, and upon the assumption that the company will receive a certain rate of interest upon all its assets, and the amount of the loading is calculated upon a certain assumed rate of expense. Now, it may happen

that the rate of mortality experienced by the company is less, and the rate of interest actually received is greater, than that assumed, and that the ratio of actual expense is less. In such case the company has in reserve more than enough, with the anticipated annual premiums, to provide for future cost of insurance and management. It has a sum which is not needed for the purpose for which it was paid. This sum is called 'profits.' It is in fact a surplus resulting from overpayments by policy holders. This surplus is derived from money paid by the insured and received by the company for a particular purpose; i. e., providing for cost of insurance, expense of management. If not needed for that purpose, it should, in equity, be returned to the policy holders. They do not, however, own it, or have any legal control over its distribution. Part of it, indeed, is derived from contributions of policy holders who are dead; but the equity is recognized, and it is the duty of the company, when a surplus is ascertained, to return such portion as it does not deem proper to keep as a guaranty fund to the existing policy holders in equitable (i. e., as nearly as practicable) proportion to their overpayments or contributions. Such return of overpayments, whether in cash or by application on future premiums, or by increase of the amount insured, is a dividend. This is the meaning of 'dividend,' and the only meaning it has or can have in connection with mutual insurance."

In New York Life Insurance Co. v. Styles, 59 L. J. Q. B. 291, L. R. 14 App. Cas. 381 (1889), it was held as follows:

"That the surplus premium income of a mutual insurance company, derived from and annually returned to participating policy holders, is not assessable to income tax as profits or gains arising from any profession, trade, or vocation exercised in the United Kingdom."

In the opinions of Lords Herschel and MacNaghten, the following passages appear:

Lord Herschel:

"In the case before us certain persons have associated themselves together for the purpose of mutual assurance; that is to say, they contribute annually to a common fund, out of which payments are to be made in the event of death to the representatives of the persons thus associated together. Those persons are alone the owners of the common fund, and they, and they alone, are entitled to the management of it. It is only in respect of his membership that any person is entitled to be assured a payment upon death. * * * Can it be said that the persons who are thus associated together for the purpose of mutual insurance carry on a trade or vocation from which profits or gains accrue to them? I cannot think so. I am aware that the surplus income with which we are concerned is called 'profits' in the documents of the appellants. But both the learned Lords who formed the majority in Last's Case repudiated the idea that because moneys, which were not in fact profits, are erroneously so called, this would make them 'profits' within the meaning of the Income Tax Acts. I entirely concur. We must look to see whether they are really so or not. Persons who agree to contribute to a common fund for mutual insurance certainly would not in ordinary parlance be regarded as carrying on a trade or vocation for the purpose of earning profit. Let us see how the so-called profit arises. It is due to the premiums which the members are required to pay being in excess of what is necessary to provide for the requisite payments to be made upon the deaths of members, and not being, as the case states they were intended to be, commensurate therewith. This may result either from the contributions having, owing to an erroneous estimate or overcaution, been originally fixed at a higher rate than was necessary, or from the death rate being lower than was anticipated. Can it be properly said that, under these circumstances, the association of mutual insurers has earned a profit? The members contribute for a common object to a fund which is their common property; it turns out that they have contributed more than is needed, and therefore

198 F.—14

more than ought to have been contributed by them, for this object; and accordingly their next contribution is reduced by an amount equal to their proportion of this excess. I am at a loss to see how this can be considered as a 'profit' arising or accruing to them from a trade or vocation which they carry on. It is true the alternative is allowed them of leaving the excess in the common fund, and so increasing their representatives' claim upon it in case of death; but I cannot think that this makes any difference. Mr. Bremner truly pointed out that, if these so-called bonuses were to be regarded as representing profits, it followed that, if the premiums were trebled, the profits would be increased in proportion."

Lord MacNaghten:

"Certain persons agree to insure their lives among themselves on the principle of mutual insurance. They take care to admit none but healthy lives. They contribute according to rates fixed by approved tables, and they invite other persons to come in and join them by insuring their lives on similar terms. The rates fixed by the tables are taken as being sufficient to provide for expenses, to meet liabilities, and to leave a margin for contingencies. What is to become of the surplus, if everything goes right? The practice is to take an account every year of assets and liabilities, and to give the insured the benefit of the surplus, either by way of reduction of premium or by way of addition to the sum insured. It can make no difference in principle whether the surplus is so applied, or paid back in hard cash. In either case it is nothing but the return of so much of the amount contributed as may be in excess of the amount really required. I do not understand how this excess can be regarded from any point of view, or for any purpose, as gain or profit earned by the contributors. I do not understand how persons contributing to a common fund in pursuance of a scheme for their mutual benefit, having no dealings or relations with any outside body, can be said to have made a profit when they find that they have overcharged themselves, and that some portion of their contributions may be safely refunded. If a profit can be made in that way, there is a field for profitable enterprise, capable, I suppose, of indefinite expansion."

In Tenant v. Smith, 61 L. J. P. C. 11 [1892] A. C. 150, a case which arose under the English Income Tax Act, Lord MacNaghten said:

"It is a tax on income in the proper sense of the word. It is a tax on what comes in, on actual receipts, * * * not on what saves his pocket, but on what goes into his pocket."

Gresham Life Assurance Society v. Bishop, 71 L. J. K. B. 618, A. C. 287, was also a case growing out of a provision of the English Income Tax Act, to the effect that "the duty to be charged in respect" of interest arising from foreign securities "shall be computed on a sum not less than the full amount of the sums which have been or will be received in Great Britain, in the current year, without any deduction or abatement." It was held that the tax was to be assessed on the amount of such interest as was actually received in that country during the year, and not on the amount constructively received in yearly accounts of profit and loss.

The above cases furnish a clear exposition of the nature and character of the dividends considered in this case. Not only is their reasoning inherently persuasive, but their authority is enhanced by the fact that there are no conflicting decisions, or at least none have been brought to the court's attention. Counsel for the government denies not so much their intrinsic weight as their relevancy, claiming that the

act under consideration has abrogated or nullified them. In other words, it is contended that by the express language of the act no dividends declared by life insurance companies can, in the ascertainment of their net income, be deducted from their gross income. No distinction between dividends is admitted, no matter how, for what purpose, or from what fund declared, or whether paid or unpaid. All are alike, and all must be taxed, because they represent income "received." If, however, as contended, Congress had in mind the cases above cited, and intended by the clause of the act in question to overrule them, it can hardly be urged that it used very clear or apt language to express its intention. On the contrary, it would appear from its language that it intended to give those cases its approval, and adopt and continue the distinction thereby created.

In seeking to ascertain the intention of Congress, it seems but reasonable to assume, in the absence of anything to the contrary, that it used the word "dividends," as applied to insurance companies, in the sense it had long and generally borne in insurance matters, which sense had, moreover, been confirmed by repeated judicial decisions. The term should, in other words, be given what might not inappropriately be called its trade signification. Hedden v. Richard, 149 U. S. 346, 13 Sup. Ct. 891, 37 L. Ed. 763. Hence, when it refers to dividends "paid," it means dividends paid, and not an application of excess premium payments in abatement or reduction of subsequent premiums. The word "paid," as used by Congress, is highly significant. It clearly shows that it had cash payments in mind. Not only does this appear from its inherent meaning, but by its use in other clauses of the section providing for deductions from gross income. The expression "gross income," as used in the act, means gross cash receipts, and the deductions which were directed to be made therefrom, in order to ascertain net "income * * * received," were deductions of cash expenditures. The principle of cash receipts and cash expenditures underlies the structure of the entire section. To hold that "paid" has a different meaning when applied to dividends from that given it in several clauses of the immediate context would be unwarranted. It should be held to mean dividends which have been paid in cash during the year, and repaid to the company as premiums. Counsel for the complainant, speaking of such dividends, well say:

"Unless so received and paid back to the company, they do not constitute 'income * * * received.' The question of income is to be determined, not by what the parties might do, but by what they do do."

If, therefore, a policy holder by the express provision of his policy elects to have a previous overpayment of premium applied in reduction of a succeeding stipulated premium, what he pays, and all that he pays, or can be required to pay, is the reduced premium, and that is all that the company receives by way of income, and all that it is liable to be taxed for. Such a construction of the act in no wise contravenes its purpose, which was to subject to taxation cash dividends, which, as statistics show, form a very large item in insurance business. Since, then, there is subject-matter which the clause of the act plainly embraces, there is neither reason nor propriety in broaden-

ing its scope of construction, so as to make it include that which, by strong implication, at least, it excludes. To do so would be violative of one of the chief rules of construction applicable to acts concerning taxation.

Before leaving this branch of the case, it seems proper to say that dividends of the kind under consideration should not be confused with dividends declared in the case of a full-paid participating policy, wherein the policy holder has no further premium payments to make. Such payments having been duly met, the policy has become at once a contract of insurance and of investment. The holder participates in the profits and income of the invested funds of the company. His case is, therefore, radically different from that of a policy holder whose dividend represents merely the excess cost of his insurance, which excess at his request, and pursuant to the terms of his policy, has been applied in abatement or reduction of a future premium. But it may be urged that the fund for which the so-called dividends are declared on mutual policies is likewise largely derived from interest on the company's investments, and that this shows that in a real sense such dividends are, after all, declared from the earnings, profits, or income of the company. This proposition might be entitled to weight, were it not for the fact that, in so far as the fund from which such dividends are declared is produced from interest on the company's invested funds, it has already been subjected to, and has paid, taxes under the act in question.

Furthermore, while perhaps not illegal, it is in a sense unfair, and therefore presumably contrary to the intention of Congress, as between a mutual company and a stock company, to tax the dividends in question as income received. The policy holder in a stock company pays a uniform and fixed premium each year. The premium in his case is not 'loaded,' but is presumed to represent cost as nearly as may be, for the reason that the stability of his policy is assured by the stock of the company, and not, as in the mutual plan, by premium payments avowedly in excess of the cost of the insurance. It would seem to be fair and equitable, therefore, between the two classes of companies, to tax them upon the premiums actually paid them by their policy holders, and not to tax one class upon premium payments actually received and the other upon payments which at the utmost are only "constructively received."

My conclusion, therefore, is that by the clause in question Congress did not overrule the authorities above cited, but, on the contrary, crystallized them into statute law, and by so doing exempted from taxation dividends of the character in controversy.

[3] The next question for consideration is whether the so-called supplementary policy contracts should be represented in the reserve fund. Concerning such contracts, the statement of the case is as follows:

"The plaintiff's policies contain an option to have proceeds paid in annual installments for a given term of years, or during the lifetime of the beneficiary, instead of in one sum. If the option is exercised, such policy upon which payments have fallen due are styled 'supplementary policy contracts.' In life insurance, the word 'reserve' means the sum which the company must

have on hand in order to meet its policy obligations. The company's reserve is also defined as the value of all its outstanding policies. The insurance commissioners of New Jersey and insurance commissioners of the other states of the United States require the plaintiff to cover its obligations on supplementary policy claims by reserve for that purpose."

The question is whether the Commissioner of Internal Revenue had the right to deduct from the company's return the net additions to reserve on account of supplementary policy claims, on the ground that they were not required by law. These obligations seem to come fairly within the definitions of reserve, as above given. Notwithstanding the policy holder has died, there still remain unpaid under the policy certain installments not presently due, but which will mature from time to time in the future. These are as much policy obligations as they would have been if payable in one sum immediately upon the death of the insured. They have a value, and that value must be estimated, and, when estimated, adequate provision made for their payment as they mature, which can only be done by the establishment of a suitable reserve. Furthermore, such reserves are "required by law" within the meaning of the act. As appears by the agreed statement of facts, the commissioners of insurance of all the states require the establishment of a reserve to cover the obligations of the company on such supplementary policy contracts. This fact of itself tends strongly to show that they are required by law. Indeed, the companies cannot transact business in the several states, except upon compliance with such regulations. It also appears in the stipulation that:

"Life insurance experts and actuaries consider supplementary policy claims as included in the term 'outstanding policies,' and as properly represented in the reserve fund of the company."

Such testimony is expert testimony of the highest character and ought not to be ignored. Furthermore, the statute of New Jersey, entitled "An act to provide for the regulation and incorporation of insurance companies, and to regulate the transaction of insurance business in this state," approved April 3, 1902 (Comp. St. N. J. p. 2836), by section 24, requires that:

"The commissioner of banking and insurance shall annually make, or cause to be made, valuations of all outstanding policies of every life insurance company doing business in this state."

And by section 56 of the same act it is provided that the commissioner of banking and insurance may apply for the appointment of a receiver whenever he shall ascertain, by examination of any life insurance company, "that the assets are not equal to the net value of all outstanding policies." Since, then, it appears that policy claims of the character referred to are outstanding policy obligations of the company, which, although not presently payable, have a value capable of ascertainment, it follows that they are required by law to be represented in the reserve for their security and protection.

Thus in Bankers' Life Insurance Co. v. Howland, 73 Vt. 1, 48 Atl. 435, 57 L. R. A. 374, the court said:

"A life insurance company is chargeable with what is called a premium reserve, representing what it must have in on hand to meet its ultimate liability on its policy."

And in New Haven Trust Company v. Gaffney, 73 Conn. 480, 47 Atl. 760, the court, in speaking of the reserve which life insurance companies are ordinarily required to maintain, said:

"Such a reserve is a fund which must equal in amount at all times the aggregate policy liabilities at their then present value."

My conclusion on this branch of the case is that these supplementary policy contracts are required by law to be represented in the reserve fund, and that so much of that fund as is annually set apart for that purpose is not subject to the tax in question.

[4] The third point is whether, for the purpose of taxation, the corporation's statement should be made on a cash or revenue basis, or, stated in another way, whether uncollected and deferred premiums and interest accrued and due, but not actually received, are proper subjects of taxation. The statement of facts concerning uncollected and deferred premiums and interest, due and accrued, but unpaid, is in part as follows:

"State insurance commissioners require insurance companies to report each year the amount of uncollected and deferred premiums as of the end of that year, but do not allow them to enter them upon their books as assets. 'Uncollected premiums' are stipulated premiums which have fallen due, but concerning the payment of which the company has not been advised at its home office. Policy holders have the option of paying yearly premiums in semi-annual or quarter-annual installments. The portion or portions of yearly stipulated premiums for the year just ended, which have not fallen due at the end of the calendar year, are called 'deferred premiums.'

"The company never, in fact, receives the full amount of the uncollected and deferred premiums outstanding at any time, and does not enter them on its books of account, except as actually received at the home office. The company did not include these items in its return to the collector of Internal Revenue for either of the years 1909 and 1910. Interest due, but unpaid, and interest accrued on the plaintiff's investments, are not entered in the plaintiff's books of account; nor did the plaintiff include those items in its returns of income for the years 1909 and 1910, made to the Collector of Internal Revenue."

The insurance departments of the different states require the return to be made on a cash basis, and this would seem to be the natural and proper method, since, when so made, nothing but actual receipts and expenditures are shown. Such a method is clear and exact, while on the revenue basis many items are necessarily open to more or less of speculation and uncertainty. Furthermore, the cash plan meets every requirement of the situation, and in a series of years would disclose and subject to taxation everything received by a company. The question for determination, however, is not which is the better method, but which does the statute require. That law provides that the tax is to be—

"one per centum upon the entire net income over and above five thousand dollars *received* by it from all sources during such year, exclusive of amount *received* by it as dividends upon stock of other corporations, joint stock companies or associations, or insurance companies, subject to the tax hereby imposed."

This language seems clearly to indicate that the net income, which is the measure of taxation, means what has actually been received,

and not that which, although due, has not been received, but its payment for some reason deferred or postponed. Furthermore, an examination of the act shows that the net income is to be ascertained by deducting from the gross income:

(1) "All the ordinary and necessary expenses *actually paid within the year* out of income in the maintenance and operation of its business and properties."

(2) "All losses actually *sustained within the year,*" etc.; "also the sums other *than dividends paid within the year* on policy and annuity contracts, and the net addition, if any, required by law to be made within the year to reserve funds."

(3) "Interest *actually paid within the year* on its bonded and other indebtedness," etc., "and in the case of a bank, banking association or trust company, *all interest actually paid by it within the year on deposit.*"

(4) "Also all sums *paid by it within the year* for taxes," etc.

(5) "All amounts *received by it within the year* as dividends upon stock of other corporations, joint stock companies or associations, or insurance companies, subject to the tax hereby imposed."

Since, then, the language of the act is explicit in permitting only such deductions from the gross income as were actually paid during the current year, it would be strange, indeed, if on the opposite side of the account the company were charged with what it had not received during the current year. No reason appears or has been suggested for so radical and unwarranted a departure. Furthermore, the word "income" means, as already shown, that which has come in, and not that which might have come in, but did not. If expenditures means what has been paid out, or outgoes, then income means what has come in, or receipts. The matter, however, does not rest entirely upon arbitrary statement, since there are a number of cases which throw light upon the question.

In United States v. Schillinger, 14 Blatchf. 71, Fed. Cas. No. 16,228, it is held:

"That in the absence of any special provision of law to the contrary, income must be taken to mean money, and not the expectation of receiving it, or the right to receive it, at a future time."

In United States v. Indianapolis & St. Louis R. R. Co., 113 U. S. 711, 5 Sup. Ct. 716, 28 L. Ed. 1140, it was held that a tax of 2½ per centum directed to be "levied and collected" for and during the year 1871, on the amount of all interest or coupons paid on bonds of certain corporations, "whenever and wherever the same shall be payable," did not cover interest earned during the year 1871, but payable thereafter. To the same effect is Railroad Co. v. United States, 101 U. S. 543, 550, 25 L. Ed. 1068.

. In People v. San Francisco Savings Union, 72 Cal. 199, 13 Pac. 498, it was held that interest accrued but not payable, and interest accrued but not paid, secured by mortgages drawing interest, are not "surplus profits." The court said:

"Under these definitions, it is not easy to comprehend how profits or surplus profits can consist of earnings never yet received. The term imports an excess of receipts over expenditures, and without receipts there cannot properly be said to be profits. Money earned as interest, however well secured, or certain to be eventually paid, cannot, in fact, be distributed as dividends

to stockholders, and does not constitute surplus profits within the meaning of the statute."

It seems almost to border upon absurdity to speak of income as including that which has not been received, and which in the ordinary uncertainties of business may never be received. How can it be affirmed of unpaid interest that it will ever be paid, or, if so, when? The same is true of uncollected and deferred premiums. It is manifestly impossible to tell when, if ever, they will be paid. The policy holder is under no legal liability to pay them. He may neglect or refuse to pay them, and thereby lapse his policy. But that is all; he cannot be sued for them; they are not debts. The company, therefore, properly refuses to treat such unpaid items as receipts. They are neither receipts nor income until paid. My conclusion is that the act contemplates that the required statement shall be made upon a cash basis; that is, upon a basis of money actually received and expenditures actually paid during the current year. Such a method, and such only, is fair to both parties, and it was substantially so admitted at the argument, on behalf of the government.

[5] The fourth and last point for consideration is whether expenditures for replacing furniture, etc., should be considered as an investment or an expense. The statement of the case concerning this item is comparatively short, and may well be given in its entirety:

"In 1909 the plaintiff expended $1,213 for ordinary renewals of office furniture; in 1910 the plaintiff expended $1,379 for ordinary renewals of office furniture, $1,808 for ordinary renewals of attendants' uniforms, door mats, window shades, awnings, small hardware, oils, and other articles of like character; also the sum of $2,244 for ordinary renewals of electrical equipment, consisting of lamps, alterations of fixtures, shades, meters, fans, plugs, wiring, etc. These expenditures were no greater than the average of similar expenditures for other years, and did not exceed 5 per cent. of the cost of all the plaintiff's existing furniture and equipment similar to the articles detailed. None of the items mentioned are considered in the plaintiff's books or statements as assets, because of their rapid depreciation. The insurance departments of the several states refused to allow them as an asset. They are not permanent benefits, but simply replacements on account of wear and tear to the home office equipment. In its returns, the plaintiff claimed a deduction from income on account of these expenses. The Commissioner amended the plaintiff's returns, so as to exclude that. The result was an increase of additional tax on plaintiff by the sum of $66.46."

The statement of facts of itself practically settles the question. The statute permits a deduction from the gross income of the corporation, among other items, of "all the ordinary and necessary expenses actually paid within the year, out of income in the maintenance and operation of the business and properties," and also "a reasonable allowance for depreciation of property, if any." The foregoing extract from the statement of the case shows that the articles mentioned are of a perishable and transient nature, and may not properly be denominated "assets." It also shows that the various insurance departments of the several states refuse to allow them as assets. Probably, if any of the items specifically mentioned

could be considered of a permanent character, it would be that of office furniture; but of this the stipulation says that it was for "ordinary renewals." The amount expended therefor was practically the same for the years 1909 and 1910. Hence the expression "ordinary renewals" may fairly be taken to mean annual renewals; while of all the items it is said "they are not permanent benefits, but simply replacements on account of wear and tear," and, again, that the expenditures were "no greater than the average of similar expenditures for other years." The items are small, and should properly be charged to maintenance; they apparently did no more than maintain in proper condition and repair the ordinary equipment of office furniture and supplies.

In Grant v. Hartford & N. H. R. R. Co., 93 U. S. 225, at page 227 (23 L. Ed. 878), Mr. Justice Bradley, in construing the Internal Revenue Act of 1864 (13 Stat. 284), says:

"The object of the law was to impose a tax on net income or profits only, and that cannot be regarded as net income or profits which is required and expended to keep the property up in the usual condition proper for operation. Such expenditure is properly classed with repairs, which are a part of the current expenses."

It was admitted at the trial by counsel for the government that under a more recent ruling of the Internal Revenue Commissioner such items are now allowed to be deducted from the gross income of the corporation. But, however that may be, it seems clear, from the character, kind, and amount of expenditure, that they afford a proper ground of deduction; and it is so determined.

Counsel for the respective parties entered into a supplemental stipulation fixing the amount for which the plaintiff would be entitled to judgment. As to each item which should be found in its favor, the stipulation follows:

"It is agreed that, if the court finds for the plaintiff on any of the following items, the amount for which plaintiff will be entitled to judgment as to each item shall be the sum stated opposite the item, with interest from January 6, 1912.

"(1) If the court finds that so-called dividends are not 'income * * * received,' plaintiff will be entitled to judgment:

    (a) For dividends allowed in reduction of renewal premiums.. $35,605.43
    (b) For dividends applied to purchase additional insurance or
        to shorten endowment term........................ 13,880.34
                                                       $49,485.77

"(2) If the court finds that the increase in reserve for so-called 'supplementary policy contracts' is a part of the 'net addition required by law to be made to reserve funds,' plaintiff will be entitled to judgment for $5,357.99.

"(3) If the court finds that the plaintiff's returns were correctly made upon a 'cash' basis, plaintiff will be entitled to judgment by reason thereof:

    (a) For deferred premiums (Agreed Facts, paragraph 14)..... $ 1,499.69
    (b) For interest due or accrued, but uncollected (Agreed
        Facts, paragraph 15)............................. 3,041.94
    (c) For matured endowment policies........................ 49.02
                                                    $ 4,590.65

"(4) If the court finds that plaintiff's expenditures for furniture, etc., were ordinary and necessary expenses, plaintiff will be entitled to judgment by reason thereof for $66.46."

The items having all been found in favor of the plaintiff, judgment will accordingly be entered thereon, pursuant to the above stipulation, in favor of the plaintiff and against the defendant, upon the first item for $49,485.77, upon the second item for $5,357.99, upon the third item for $4,590.65, and upon the fourth item for $66.46, with interest upon each item from January 6, 1910.