PENN MUT. LIFE INS. CO. v. LEDERER, Collector of Internal Revenue.

(District Court, E. D. Pennsylvania. February 4, 1918.)

No. 3724.

1. STATUTES ⚖═215—CONSTRUCTION—REVENUE LAWS.

While taxing statutes are to be strictly construed, this merely means that neither the courts nor the executive may, through judicial or administrative construction, impose a tax not imposed by Congress, and, when Congress has indicated its purpose and intent to tax, the law is not to be

⚖═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

strictly construed, but is to be given that construction given to remedial statutes.

2. INTERNAL REVENUE ⬤⟹9—INCOME TAX—DEDUCTIONS.

Revenue Act Oct. 3, 1913, c. 16, § 2, G(b), 38 Stat. 173, provides that mutual marine insurance companies shall include in their return of gross income gross premiums collected and received, but shall be entitled to include in deductions amounts repaid to policy holders on account of premiums previously paid and interest upon such amounts, and that life insurance companies shall not include as income in any year such portion of any actual premium received from any individual policy holder as shall have been paid back or credited to such policy holder or treated as an abatement of premium within such year. *Held* that, where a mutual life insurance company exacted the advance payment of an estimated reasonably safe maximum premium and returned to policy holders the excess after the actual cost of the insurance was known, it was entitled to exclude from its gross income all moneys so repaid to policy holders within the year, if previously received for premiums, whether received during the year or not.

3. STATUTES ⬤⟹216—CONSTRUCTION—OPINIONS OF MEMBERS OF CONGRESS.

While an act of Congress must ·be accepted for the purpose of interpretation in the form in which it was finally passed, and cannot be altered or amended to conform to the meaning given it by individual members who advocated its passage, or by a committee which may have discussed it in a report, such expressions of opinion are entitled to weight in construing the law.

4. INTERNAL REVENUE ⬤⟹9—INCOME TAX—DEDUCTIONS—"DIVIDEND."

Under Revenue Act Oct. 3, 1913, § 2, G(b), a mutual life insurance company, limiting premiums to actual cost, but exacting the advance payment of an estimated reasonably safe maximum premium, and returning the excess after the actual cost is known, is entitled to exclude from its gross premiums the amounts so paid to policy holders, though there have been some accretions by way of interest or other profit, and though the statute forbids the taxable income to be reduced by dividend payments, as the word "dividend" merely means a unit portion of something which has been divided, and does not necessarily include the thought of profit, and the dividends referred to are not to be deducted because they have once been excluded.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Dividend.]

5. CONSTITUTIONAL LAW ⬤⟹70(3)—JUDICIAL FUNCTIONS—WISDOM OF LEGISLATION.

In construing a law, the judicial inquiry is not into what enactment Congress should have made, but into what enactment Congress did in fact make.

6. INTERNAL REVENUE ⬤⟹9—INCOME TAX—DEDUCTIONS.

Under Revenue Law Oct. 3, 1913, § 2, G(b), a mutual life insurance company, limiting premiums to the actual cost of the insurance, but exacting the advance payment of an estimated reasonably safe maximum premium, and returning the excess after the actual cost is known, is entitled to exclude from the gross income amounts so repaid to policy holders, though representing the return of premiums received before the enactment of the statute, as the act is to be construed as a system of taxation, as if it had always been in force and had never had a beginning.

At Law. Action by the Penn Mutual Life Insurance Company against Ephraim Lederer, Collector of Internal Revenue. On trial hearing before the court sitting without a jury. Judgment for plaintiff.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

George Wharton Pepper, of Philadelphia, Pa., for plaintiff.
Francis Fisher Kane, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. Trial by jury was, by stipulation made in accordance with the acts of Congress on the subject, waived by the parties. The facts, in the sense of the evidentiary facts, are not in controversy, nor indeed is there much, if any, conflict over the ultimate fact findings. The case is really one involving only a question of law arising out of differences in the interpretation of the Revenue Act of October 3, 1913, and is to all substantial intents and purposes a case stated. The atmosphere in which, under the present war conditions, every responsible interpreter of revenue laws finds himself, induces a disposition to incline to that interpretation of the revenue laws which will result in producing revenue. Congress, however, is to be presumed to have been influenced by a like attitude, and to have taxed everybody and everything which were deemed proper subjects of taxation. There is, in consequence, no call upon the courts to extend by construction the taxable lists as made up by Congress. Neither of these observations, however, involves the thought of a change in the proper rule of the construction of statutes.

[1] We have been reminded by counsel for the plaintiff that the accepted rule is, as the doctrine is sometimes phrased, "that taxing statutes are to be strictly construed." Care must be exercised in the use of this phrase, as of all other general expressions, so as not to permit the true doctrine to be misunderstood. It does not mean, as it is sometimes thoughtlessly assumed to mean, that the courts, in construing such statutes, should lean strongly toward the taxpayer, and add the weight of all their power and authority to a resistance to the collection of the tax. The doctrine is more fundamental, and has a historical basis to be found in the political history of our people. It is the American doctrine that the people govern themselves, and a vital part of that principle is that they, and they only, tax themselves. No tax can in consequence be imposed except by their representatives in Congress, and a further negative consequence is that no tax can be imposed by the courts or the executive, through judicial or administrative construction of statutes. This is the sense in which tax laws are to be strictly construed. When, however, Congress has indicated its purpose and intent to tax, the tax must be paid, and the courts cannot refuse to enforce that purpose and intent merely because, in the expression of its will, Congress has failed to dot or to cross some of the letters which make up the written words in which that mandate is recorded. In this sense laws for the raising of revenue are not to be strictly construed, but are to be given that construction which is given to remedial statutes. In other words, the doctrine is a broad and not a picayune one.

With this prelude, we come to the reading of this statute. It clearly contains the general command to this plaintiff, and other like corporations, to pay a tax. We cannot understand just what payment is commanded to be made, unless we first understand what these corporations are and the nature of the business which they transact. This is in an emphatic sense part at least of the subject-matter of the law. It

will be found that they are somewhat complex in character and their business partakes of a like complexity.

The "mathematician" of the plaintiff has presented this phase of the question in a very intelligible and clear-cut way by presenting groups of typical transactions in a numbered series, so that we can get, at almost one glance, a view of all the phases which the general question presents. It will contribute something to our clarity of view if we take up one by one the consideration of each of these elements into which the character of these corporations and the general business they do may be analyzed.

In the first place, they are insurance companies; but they are as well mutual insurance companies. This means they receive premiums, but these premiums are limited to the actual cost of the insurance. The practical conduct of such a business requires of them to exact the advance payment of an estimated reasonably safe maximum premium, and to return to the policy holders the excess after the actual cost of the insurance is known. This may be and is properly done annually. The elements which go to make up this excess we do not see to be of importance, although they do have some illustrative value. The practical workings of this plan make evident a result, which is indeed suggested by the plan itself, that the premium receipt and the excess return seldom take place within the limits of the same fiscal or calendar year, although a year would measure the time interval. The receipt of the advance premium suggests the further thought, which actual practice confirms, that the policy holder may not desire the return of his excess refund, but may wish to apply it to what is called "the purchase of additional insurance." To provide for this the contract has ingrafted upon it the thought of the face amount payable under the policy automatically increasing accordingly. Although called (and properly so) life insurance companies, they do not always adhere strictly to this plan; but it is modified to the extent of being made an insurance, not against death, but against death occurring within a named term of years, and the insured sum becoming payable at the end of the period. The language of life insurance thus comes to furnish us with the terms "plain life" and "endowment" policies. The essentials of the plan are not, however, changed by this.

At this stage in the recital of what is done, the hearer would doubtless be impressed with the thought that the policy holder, having once made his election, was bound by it, and could not afterwards demand the refund to which he would have otherwise been entitled. Whatever the contractual or other right of the company to retain the money, it does not (and the motive for this is apparent) insist upon, but accords, the free right of the policy holder to withdraw at any time the whole or any part of what we will call his "deposit." The use of this word serves to present the thought that the company, having these deposit moneys, has put them at work, and there is in consequence an accretion by way of interest or other profits, and that this also belongs to the depositor. The companies thereupon become or partake of the nature to this extent of savings fund companies, and are subjected to the administrative expenses which are thereby incurred. The introduc-

tion of paid-up policies and other forms of matured insurance contracts, in which there is the thought of the maturing, in the sense of the fixing, of the obligation to pay at a future time without further premium payments, and also in the sense of the obligation to pay at once, adds to these companies some of the characteristics of building associations, and the leaving with the company of insurance moneys then demandable, with the allowance of interest thereon or other return, the issue of trust certificates and the added feature to policies of not paying a round sum to the beneficiary, but granting him an annuity instead, as well as other modifications of the simple life insurance contract, all give a complexity to the character and business of these companies, such as that even an otherwise concise statement of them would run into undue length.

One other of such modified forms of contract does, however, have perhaps a direct relation to the legal question before us. These companies, to the extent to which their practical dependence upon the laws of the different states in which they do business will permit, make of themselves managers of a lottery. This springs from the issuance of tontine, semitontine, and other modified forms of what is known as tontine insurance. The essential thought is that these accumulations of moneys, in part contributed by a given group or class of policy holders and in part accretions to the moneys thus contributed, are shared in whole or part, not by the contributors, but by the persistent livers and premium payers among them. Their title, such as it is, is by right of survivorship.

This gives us a sufficiently adequate idea of the corporations which Congress sought to tax and of the business done by them. Let us, in further aid to a proper interpretation, attempt to get the viewpoint of the draughtsman of the act. What may be called the first or original draughtsman had evidently a clear-cut, well-defined idea of whom and what he intended to tax, and had in mind an orderly and logically developed method of reaching the amount of the tax. What he had in mind to tax was what is understood by the phrase "net income." To reach this he took into account gross income, excluding therefrom, however, certain elements or items, and from this remainder he permitted to be deducted certain other clearly defined elements or items, and the balance was to be the taxable net income. This distinction between what was to be excluded by not being included in gross income, and what was to be deducted from the gross income thus stated, was preserved throughout what may be recognized as the original draft of the act. A mere verbal contrast of "not including" with "deducting" would call for the comment of "distinction without difference"; but there is none the less a real practical difference worked through and by the distinction. The distinction, however, works no difference in the final result of determining the amount of the tax. It has, moreover, not been always clearly observed throughout the whole statute. We find the departure in some of the provisos of the act. We have the right to call upon our knowledge of the practical workings of legislation for the explanation of this. Further "exclusions" or "deductions" than those appearing in the original draft were suggested. These took

the form of being expressed after the phrase "Provided further," or equivalent words. As the result was the same, the distinction was to some extent lost, and was dropped in some of the provisos. This explanation, if a probably good one, is of some aid to us, because the distinction is clearly observed in dealing with marine insurance companies, and is not observed, or at least so clearly observed, in the next following clause, which deals with mutual life insurance companies.

This doubtless unduly long explanation brings us at last to the act of Congress to be construed. Act Oct. 3, 1913, c. 16, 38 Stat. 114. The clause is:

"Provided further, that mutual marine insurance companies shall include in their return of gross income gross premiums collected and received by them less amounts paid for reinsurance, but shall be entitled to include in deductions from gross income amounts repaid to policy holders on account of premiums previously paid by them and interest paid upon such amounts between the ascertainment thereof and the payment thereof and life insurance companies shall not include as income in any year such portion of any actual premium received from any individual policy holder as shall have been paid back or credited to such individual policy holder, or treated as an abatement of premium of such individual policy holder, within such year." Section 2, G(b), 38 Stat. 173.

[2] This clause relates both to mutual marine insurance companies and to mutual life companies. The part of the proviso which relates to the former is admittedly sufficiently clear in the expression of its meaning. What it means, and the effect of such meaning upon the clause relating to life companies, will be considered hereafter. Reading the latter clause by itself, in the sense of an enactment removed from its setting and away from the light afforded by the context, it may be read as counsel for plaintiff reads it. If we grant that it may also be read as counsel for the United States read it, the decision to be made is presented. To decide it we may adopt the corrective caution of the old surveyors, which golfers follow upon the putting greens. We will thus seek to verify or correct the foreview by reversing the line of sight and by taking a hindsight. So viewed, the clause reads that moneys which have within the year been paid back to policy holders, or so treated, shall not be included in the gross income return of the companies, if such moneys were previously received from the policy holders as premiums. When so read, it becomes clear that the clause cannot be given the meaning which the United States gives to it without adding an expression of the thought that the moneys so paid back within the year shall have also been received within the year. If the right to add this further thought or make this interpolation be denied to the reader, then the clause must be read as counsel for the defendant reads it, to wit: That all moneys which have been paid back to the policy holders within the year shall be excluded from gross income, if these moneys shall have been previously received for premiums, whether received during the year or not.

[3] Recurring now to the marine clause, the two classes of corporations will be found in this respect to be put upon the same footing, except in certain particulars, one of which is that the return premiums paid on marine policies are deducted from the total income, and those

paid on life insurance contracts are excluded from gross income. Al-. though it is, of course, true that an act of Congress must be accepted for the purposes of interpretation in the form in which it was finally passed, and cannot be altered or amended, so as to conform to the meaning given to it by an individual member who advocated its passage, or by a committee which may have discussed it in a report, nevertheless the expression of opinion thus given is entitled to weight by any one called upon to judicially construe the law. This is for two reasons. One is that such an expression of opinion should be given the weight which is given to the opinions of text-writers, members of the bar, and the obiter dicta of judges. Another is that such an expression of opinion makes clear that a construction which is in accord with such opinion is neither a strained construction nor an afterthought, because it is evidence of a contemporaneous construction given to the law at the time of its passage. We know from the records of Congress that the committee, reporting the bill, in discussing the clause in question, which had been added to the bill in committee, reported to the House that the purpose of adding the clause was to place life insurance companies on the same footing as marine companies. The weight of the opinion thus expressed is felt.

The thought thus inadequately expressed leads to the conclusion, from a statement of which the thought itself can be more clearly gathered, that the defendant had the right to exclude from its statement of gross income for any year all moneys which within that year it had returned to policy holders, provided the moneys thus excluded were parts of the moneys which had been previously paid to the company for premiums, whether they had thus been received by the company within the year or before.

[4] We are led to this conclusion because, to re-express the same thought, we cannot get the meaning out of the clause which the United States gets out of it without adding to the clause something which is not in it. In other words, the act of Congress says to the plaintiff the moneys which you exclude must have been paid back to policy holders within the same year from the return for which you have excluded them. That is in the act. The moneys you exclude must have been previously paid to the company by policy holders for premiums. This, also, is in the act. Finally, the moneys must have been thus paid to the company "within the same year." It is this final thought which is not in the act. When, however, we come to what is to be thus excluded, we find another difference between the returns which marine and life companies are respectively to make. Marine insurance companies are to deduct, not only the premiums thus repaid, but also all accretions by way of interest to the unused premiums while in the hands of the company. This is expressly stated. In the case of life companies, there is not only an absence of any equivalent expression, but it is expressly stated that the excluded sum shall be limited to such portion of the "actual premium" as shall have been both received and paid back.

The conclusion asked to be drawn from this is that all accretions to the fund which is left with the company during the interval between

the receipt and return of the premiums should not be excluded from gross income, but remain to swell the sum of the gross income return, and thus be made to swell the taxable net income.

Confirmation of the soundness of this second finding asked to be made is thought to be found in an earlier provision of the act which forbids the taxable income to be reduced (and this is meant to cover both "exclusions" and "deductions") by "dividend" payments. The phrase is "sums other than dividends paid within the year on policy and annuity contracts" shall not be included in taxable income. The clear implication is that there shall be no deductions because of "dividend" payments. As readers and hearers we should be ever on guard to prevent our minds playing any tricks upon us by being affected by what a famous writer has happily called the "polarization" of words. The word "dividends" partakes somewhat of the character of such words. To the ears of those fortunate enough to be placed within hearing distance of the word, it has a pleasant sound suggestive of the "cutting of a ripe melon." It means a share of profits. Sums so paid, of course, should neither be "excluded" nor "deducted" in the ascertainment of net income. Such "dividends" mean merely the distribution of the whole or part of the "net income" to the happy individuals who have a right to share in it.

As a consequence, counsel for defendant manifest an inclination to dwell upon the word "dividend," and to speak of what policy holders receive as a "dividend." Counsel for plaintiff show a tendency to avoid the use of the term, or, when they do employ it, they are fond of qualifying it by a slighting phrase. It is a "so-called" dividend. We do not share either in this fondness for or aversion to the use of the word. It is clear that the profit-sharing thought is altogether an applied meaning, which the word at times properly has. It may, however, be properly employed when the thought of profit is wholly absent, and the word has its etymological meaning of a unit portion of something which has been divided. The confirmation claimed, however, loses all its value when we find that, in making up the return of mutual insurance companies, they are directed to exclude from gross income the dividends referred to, and, having been once "excluded," they are not later to be "deducted," because this would result in an undue, because doubled, reduction to that extent in the final sum reached.

Disregarding the confirmation of the thought, and coming back to the thought itself, there is this to be said. The income of mutual life companies has as its first source premium payments advanced by policy holders. The temporary possession of the fund thus accumulated, and the nonreturn to some policy holders, supplies a second source of income through accretions to this temporary fund by way of interest or other profit. In consequence, the moneys returned to policy holders may be said to be, not the return of a portion of the "actual premiums" payment, of which they had previously made, but as made up in part, or indeed perhaps wholly, of the policy holder's share of profits. As, however, the basis of the payment finally exacted of the policy holder is his share of the net cost of insurance, had this cost been known in advance of payment the sum paid would have been less than was paid,

and this difference, when returned to him, may well be said to be a return of a portion of the "actual premium" paid. The real truth is that what is done is not done so that any trace is left of the process, but it is one of those things done of which we may have a mental concept as done in one way or done in another. The best answer to the question of whether the policy holder receives back a portion of the "actual premium" paid by him, or whether he receives part of the profits which his company has earned, can be given by expressing a concept of what was done, such as to present the substantial results of what was done. The thought is expressed by the phrase to which there is a common resort when confronted with such a dilemma. The phrase is, "That is what it comes to," or "amounts to." The decision of the question partakes more of the nature of a rescript than a reasoned result, but the necessity of reaching such more or less arbitrary conclusion is forced upon us. We have a sufficiently clear indication of the will of Congress with respect to marine insurance companies. Speculation would be idle over why Congress differently expressed its will in the case of life insurance companies, if like treatment was meant to be meted out to both. The words of the act, however, may be so read, and there would seem to be good grounds of belief that Congress so intended.

The view we have expressed is in accord with the ruling made in Mutual Ben. Life Ins. Co. v. Herold (C. C.) 198 Fed. 199, affirmed in 201 Fed. 918, 120 C. C. A. 256. We think it is to be assumed that this ruling was in the mind of Congress when it came to choose its words in the act of 1913, and again in 1916. It thus appears that the payment of more than the lawful tax was exacted of the plaintiff. If this be true, we understand it to be conceded that the plaintiff is entitled to judgment, so that no other features of the plaintiff's case need be considered.

The discussion of the questions involved in this case is doubtless already overfull. We find ourselves, however, in disagreement with the views of those who have to do with the administration of these tax laws, and with the views of counsel who have given to their study much more thought and time than is possible to give to them in the press of litigation. Because of this we think it the due of counsel that the several positions at which they take their stand should be squarely faced, even at the cost of a repetition of our views. As a prelude this may be stated. Back of the whole discussion is the fact that moneys which have been received, but which are required to be returned, if returned, form no part of real income. The taxing authority need not recognize the propriety of a reduction merely because there is an obligation to return. Several very practical considerations would support this refusal. When, however, the obligation to return has ripened into an actual return, and both the return and the amount of the return become fixed facts, the supports of such refusal are removed. There is really no difference in the basic thought presented by the respective counsel and sought to be contrasted. The difference is in the practical results following different modes of applying the thought. The thought springs out of the fact, already several times stated, that the

policy holders make a deposit out of which the moneys required to meet the cost of insurance are taken and the overplus is returned. The part retained is properly income received; the part returned is in no real sense either income or received. So far there is agreement. Counsel for the United States, however, in applying this basic thought present three subthoughts:

(1) Unless the part returned is returned in the same year in which it was received, it is to be treated as not returned at all.

(2) Deposits thus made before the passage of the act are separated as by a wall from deposits afterwards received, and no drafts made upon these earlier deposits to reimburse policy holders for any excess in such deposits can be permitted to affect (by reducing) the income later received.

(3) The fact that the deposits have been swelled, while with the company, by interest, by tontine, and by other accretions, results in demanding the finding that the moneys returned to policy holders are not moneys previously paid by them, but (in part at least) profits or earnings made by the company and distributed among its stockholders which the policy holders then become.

The three positions thus taken involve propositions which have already been discussed, but, in order to squarely meet them, we will summarize the views already indicated.

[5] 1. The arguments of both plaintiff and defendant partake of the nature of arguments which are more properly addressed to Congress than to the courts. Each is planted, to some extent, upon what may be deemed the principles of natural justice. Plaintiff urges the inequity, if not iniquity, of double taxation. Defendant points out that the taxpayer is seeking to escape the payment of taxes by reducing an income, subject to the tax, by claiming reductions which properly lessen, not the income which is subject to the tax, but an earlier income which is not subject to the tax. The judicial inquiry, it is clear, is not into what enactment Congress should have made after a just balancing of these considerations, but into what enactment Congress did in fact make. Our conclusion or finding of what Congress did do has already been several times stated; but we restate it, so it will here appear. The gross income is to be reduced by the amount of premiums returned, if previously received, no matter when received.

[6] 2. Our finding upon the second point need not be further discussed than by its restatement. A distinction might well be made between the return of premium receipts, which have never figured in taxable income because received before the act, and those which have been since received. Because, however, the distinction might have been made, or indeed well made, it does not follow that it was made. In determining whether it was made, we may fall back upon the principle that the act is to be construed, as a system of taxation, as if it had always been in force and had never had a beginning. It is further to be assumed that, if Congress had not had in mind that this principle was to be applied, they would have so enacted. The conclusion reached is that Congress has made no distinction between the income return

for the first year (or the ten months part of the year) and the returns for the succeeding years.

3. The third proposition is open to the same comment. There is, it must be admitted, a more or less arbitrary choice made, in the acceptance of either of the two concepts of what it is which is returned to policy holders—whether it is a return wholly of a portion of the premium deposits previously made by them, or whether it is in whole or part a distribution of profits among them. The choice we have made is not, however, wholly arbitrary, because we have chosen that one which is in harmony with the other concept of a mutual life insurance company as an association of policy holders who insure themselves by ultimately paying the net cost of carrying their own life risks, although for very practical reasons they pay down in advance a round sum which would be limited to this actual cost, if the cost were known at the time of payment. Not being so known, they pay a sum large enough to safely cover it, with the understanding that the excess will be returned to them. So viewed, what they get back is a part of what they have previously paid.

This in principle decides the case before us. We do not have at hand the figures expressive of the sum for which plaintiff is entitled to judgment, in accordance with the general findings made, nor have we been informed whether counsel ask for special findings. There was an unavoidable interval between the trial and the consideration of the briefs submitted. It may be that there are features of the case, which enter into the ascertainment of the sum for which judgment should be entered, which the above discussion does not cover, and which would affect the amount of the judgment. To meet this situation, counsel have leave to submit requests for findings from which the amount for which judgment should be entered can be determined, together with any requests for special findings they may wish to submit, if any.

Formal judgment will then be directed to be entered.