Nelson H. Sturgis, Jr. v. Commissioner.
Nelson H. Sturgis, Jr. v. Commissioner
Docket No. 20898.
United States Tax Court
1951 Tax Ct. Memo LEXIS 338; 10 T.C.M. (CCH) 136; T.C.M. (RIA) 51041; January 30, 1951
Oliver A. Wyman, Esq., 31 Milk St., Boston 9, Mass., for the petitioner. Joseph Landis, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner originally determined a deficiency in income tax for the year 1944 in the amount of $1,909.54. Increase in the amount of the deficiency *339 has been claimed by the respondent under section 272(e) of the Code. The issues in this proceeding are (1) whether or not the petitioner was a bona fide resident of Iran during the entire year of 1944, and (2) if the petitioner was not a bona fide resident of Iran during the entire year 1944, whether or not he is required to include in his gross income "dividends" which were applied against the premium on a policy of insurance on his life, the premium of which was paid by his employer for his benefit. The petitioner filed his return with the collector for the district of Massachusetts. Findings of Fact The facts which have been stipulated are so found. The petitioner has been employed as a chemical engineer by E. B. Badger & Sons Company (hereinafter referred to as "Badger Company") since 1928, except for a period during 1942 and 1943 when, at the request of the Badger Company, he was placed on the payroll of The M. W. Kellogg Company, which was doing work for the Badger Company. The business of the Badger Company is the designing, engineering, and construction of oil and chemical plants. During the early part of 1942, the Badger Company entered into a contract with the *340 Anglo-Iranian Oil Company for the construction of petroleum refineries in Iran. At the request of the Badger Company, the petitioner executed an employment contract with The M. W. Kellogg Company on April 22, 1942, for employment in Abadan, Iran, in connection with the contract between the Badger Company and the Anglo-Iranian Oil Company. The employment contract provided that the petitioner was to be employed for an indefinite period; that the employment was at will only and subject to summary termination at any time; that the employer should furnish transportation to the petitioner from his point of origin to Abadan and return; and that room, board, and free medical service were to be provided to the petitioner during his stay in Abadan. In consideration of the execution by the petitioner of the employment contract with The M. W. Kellogg Company for services in Abadan, the Badger Company entered into a supplemental agreement with the petitioner under which it agreed: * * *
"1. To provide or cause to be provided life insurance in the amount of $15,000, in addition to workman's compensation and war risk insurance which includes the risks involved in transit and while in Abadan *341 or while temporarily located in any other country. The war risk insurance will be that worked out by Marsh and McLennan in conjunction with Mr. B. R. Jackson of Anglo-Iranian Oil Company. All insurance should be carefully examined by Nelson H. Sturgis, Jr. to assure himself that he is properly protected. "2. To guarantee $110 per week during any period in which he is unable to work for non-compensable reasons but not beyond the completion of the contract of E. B. Badger & Sons Company with Anglo-Iranian Oil Company and in no event beyond a period of eighteen months. It is understood, however, that such payments are not in addition to payments made by M. W. Kellogg Company but only of such sums in excess thereof as to fulfill this guarantee. "3. That income taxes assessed against Nelson H. Sturgis, Jr. by other than the United States shall not be paid by him but shall be paid by others. In this connection, any income tax assessments made against Nelson H. Sturgis, Jr. personally by other than the United States Government shall be referred to the Anglo-Iranian Oil Co., Ltd. or to us for payment, and should not be paid by him unless specifically authorized by Anglo-Iranian Oil Co. *342 , Ltd. or us. "4. That although carried on the pay roll of M. W. Kellogg Company the status of Nelson H. Sturgis, Jr. shall be such as to permit us to fulfill our contractual obligations with Anglo-Iranian Oil Company. Nelson H. Sturgis, Jr. can be discharged only with the consent of E. B. Badger & Sons Company, and transportation provided shall be subject to approval of E. B. Badger & Sons Company." * * *
The petitioner remained on the payroll of The M. W. Kellogg Company until January 1, 1944. On January 1, 1944, the petitioner was placed on the payroll of the Badger Company. However, this entailed no change in the nature of his employment which continued to be as an engineer in connection with the construction of the petroleum refineries. On February 15, 1944, the petitioner executed an employment contract with the Badger Company for an indefinite period covering the duration of the time required for the completion of the petroleum refineries. This contract incorporated the provisions of both the petitioner's prior agreement with The M. W. Kellogg Company and his prior agreement with the Badger Company. The petitioner left the United States on April 24, 1942, and arrived *343 in Abadan, Iran, on June 2, 1942. Before leaving the United States, he received permission from his draft board to leave the country. On his arrival in Iran, the petitioner registered with the American consulate and procured a residence permit from the Iranian government. He then began his duties as a chemical engineer in the construction of the refineries. The petitioner intended to remain in Iran only for the length of time required to construct the refineries. It was originally estimated that the work would take at least eighteen months to complete. Because of the authorization of additions to the project in 1943, the work was not completed until November 1945. During this time the petitioner was in Iran continuously, except for a period of about three months during 1944 when he returned to the United States for consultation in connection with his employment and for a ten-day vacation. The petitioner's employer made all the arrangements for this trip and paid the traveling expenses of the petitioner. The petitioner had no intention of becoming a permanent resident of Iran. At the time that the petitioner entered into the contract for employment in Iran, he was a married man *344 with a family which consisted of his wife and infant son. Another son was born to him and his wife in November 1944. During his stay in Iran, the petitioner's family lived in a rented apartment in Arlington, Massachusetts. It was the intention of the petitioner to return to Arlington upon the completion of his work in Iran, which he did. During the time that the petitioner was employed by the Badger Company in 1944, the company deposited his salary less advances he had drawn in a joint bank account which the petitioner and his wife maintained with the Harvard Trust Company in Cambridge, Massachusetts, pursuant to the instructions of the petitioner. Beginning on March 27, 1944, the petitioner directed the company to deduct $18.75 each week from his salary with which to purchase war bonds in the name of himself and his wife and to send the bonds to his wife in Arlington. From the time that the petitioner arrived in Iran in June 1942, until he left in November 1945, his room and board were provided by his employer. Room and board were not otherwise available to civilians in Iran during this period. While in Abadan, the petitioner belonged to a golf club and a gymkhana club there. *345 The petitioner was not a bona fide resident of Iran during the entire taxable year 1944. Pursuant to the contracts of employment, the Badger Company purchased a policy of insurance, including war risk insurance, on the life of the petitioner, which was payable to a beneficiary designated by the petitioner. The petitioner designated his wife as his beneficiary, and the contract of insurance was in the possession of the petitioner's wife during 1944. The petitioner considered the policy to be his own during 1944. During 1944 the premium on this life insurance policy was paid by the Badger Company. No part of the premium paid by the company was deducted from the petitioner's salary. The premium was paid as follows: Cash
$684.45
Dividends earned on policy in 1943, ap-
plied in 1944 to payment of 1944
premium
45.15
Interest earned on 1943 dividend
1.35
Dividends earned on policy in 1944, ap-
plied in 1944 to payment of 1944
premium
46.05
$777.00
On June 3, 1946, the petitioner surrendered the policy to the insurer and directed that the cash surrender value be paid to the Badger Company pursuant to the request of the company. The cash surrender value of *346 the policy of life insurance at the time it was surrendered was $780, no part of which was established during the calendar year 1944 or prior thereto. The net premium paid by the Badger Company on the contract of insurance on the petitioner's life for the year 1944 was $684.45. Opinion The primary issue in this proceeding is whether or not the petitioner was a bona fide resident of Iran during the entire year 1944. If, as the petitioner alleges, he was a bona fide resident of Iran throughout 1944, he is exempt from income tax on income which he earned without the United States during that year under section 116(a) of the Internal Revenue Code. However, if the contention of the respondent is correct and the petitioner was not a bona fide resident of Iran, he is taxable on such income. In prior cases, we have discussed the legislative history of section 116(a), as amended by section 148(a) of the Revenue Act of 1942, and have said that "prior to the 1942 Act, section 116(a) permitted foreign income to be tax-free where the taxpayer was merely a 'bona fide non-resident' of the United States for more than six months of the taxable year; that the purpose of *347 the 1942 amendment was to narrow the exemption; that when the 1942 legislation was pending in the House of Representatives, the exemption was completely eliminated, but that it was restored in a restricted form by the Senate; and that the purpose of the provision was explained by Senator George, the Chairman of the Senate Finance Committee, as follows "(Hearings before Senate Finance Committee on H.R. 7378, 77th Cong., 2d Sess., Vol. 1, p. 743): "* * * I think it is recognized that the complete elimination of section 116(a) was not really intended, that it was not the primary purpose in the case of the bona fide, nonresident American citizen who established a home and maintains his establishment and is taking on corresponding obligations of the home in any foreign country, but there is some need for treatment of this section, so that the technicians, American citizens who are merely temporarily away from home could be properly reached and properly dealt with for taxation purposes." See, also, S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 54-55, 116. The criteria to be used in determining whether or not a citizen of the United States is a bona fide resident of a foreign country *348 are the same as those which are applicable in determining whether or not an alien is a resident of the United States. Herman Frederick Baehre, 15 T.C. 236 (promulgated Sept. 20, 1950); Arthur J. H. Johnson, 7 T.C. 1040; Seeley v. Commissioner, 186 Fed. (2d) 541 (C.A. 2, Jan. 2, 1951), affirming in part and reversing in part 14 T.C. 175; Regulations 111, section 29.116-1. These criteria are listed in Regulations 111, section 29.211-2, and are reprinted in the margin. [1]
*349 The issue presented has been decided by us contrary to the contention of this petitioner in a number of prior reported and unreported decisions which involved American citizens who were absent from the United States on jobs involving the war effort. Thus in Michael Downs, 7 T.C. 1053, and J. Gerber Hoofnel, 7 T.C. 1136, employees of Lockheed Aircraft Corporation who worked at various air bases in England and Northern Ireland for several years during World War II were held not to be bona fide residents of any foreign country. These decisions were affirmed in a single opinion, Downs v. Commissioner, 166 Fed. (2d) 504, certiorari denied, 334 U.S. 832. Similar results were reached in Carl H. Thorsell, 13 T.C. 909; William B. Cruise, 12 T.C. 1059; Dudley A. Chapin, 9 T.C. 142; Ralph Love, 8 T.C. 400; and Arthur J. H. Johnson, supra.[2]
The question of whether the petitioner was a bona *350 fide resident of Iran throughout 1944 is one of fact. The determination of the issue in each proceeding must be determined by reference to the particular facts present in the proceeding. See; Audio Gray Harvey, 10 T.C. 183; Charles F. Bouldin, 8 T.C. 959; cf. 1 Beale, Conflict of Laws 109 (1935). We think the facts in this proceeding fall within the ambit of the decisions typified by the Downs case and that a similar result should be reached. In this proceeding the petitioner was sent to Iran in order to perform technical services of an engineering nature in connection with a war emergency project involving construction of petroleum refineries. His intention was to remain in Iran only as long as was required to construct the refineries. He had no intention of becoming a permanent resident of that country. At the time that the petitioner entered into the contract for employment in Iran, and during his stay in that country, he was a married man with a family. Throughout his stay in Iran, the petitioner's family resided in Arlington, Massachusetts. It was the intention of the petitioner to return to Arlington upon the completion of his work in Iran. His contract *351 of employment provided that his employer should furnish transportation from his home in the United States to Iran and then back to his home upon completion of his services abroad. During the time that the petitioner was employed by the Badger Company in 1944, the company deposited his salary less advances he had drawn in a joint bank account which the petitioner and his wife maintained with the Harvard Trust Company in Cambridge. From the time that the petitioner arrived in Iran in June 1942, until he left in 1945, his room and board were provided by his employer. Room and board were not otherwise available to civilians in Iran during this period. Although the petitioner belonged to a golf club and a gymkhana club in Iran, these facts alone, especially in the absence of any other indication of the petitioner's participation in the social life of the country, are not indicative that the petitioner was a bona fide resident of Iran. At all times the petitioner's intention to return to the United States was fixed and definite, except as to time. His contract of employment provided that it could be terminated at any time without cause at the option of his employer. Upon the completion *352 of his work in Iran, the petitioner returned to his family in the United States. From our examination of the facts in this proceeding, we are convinced that the petitioner was not a bona fide resident of Iran during the entire taxable year 1944. In the cases relied upon by the petitioner, the showing that the taxpayer had made his home in the country involved and had identified himself in some degree with the customs and activities of that country was much stronger than is indicated by the evidence in this proceeding. We think rather that the facts here bring the proceeding more closely within the line of decisions exemplified by the Downs and Johnson case, supra. It is held that the petitioner was not a bona fide resident of Iran during the entire taxable year 1944. The remaining issue for decision is whether $684.45 or $777 is includible in the petitioner's income by reason of the payment by his employer of the premium on a policy of insurance on the petitioner's life. Pursuant to the contract of employment, the Badger Company provided insurance on the life of the petitioner during 1944 which was made payable to a beneficiary designated by the petitioner. The gross amount *353 of the premium was $777. This was reduced by the credit of so-called "dividends" to a net premium of $684.45, and the latter amount was paid by the company. The petitioner now agrees that the premium paid by his employer constitutes additional income to him. See Commissioner v. Bonwit, 87 Fed. (2d) 764, certiorari denied, 302 U.S. 694; Yuengling v. Commissioner, 69 Fed. (2d) 971; G. M. Adams, 18 B.T.A. 381. However, the petitioner contends that the amount of the premium paid by his employer was only $684.45 and not $777 as alleged by the respondent, and, further, that the cash surrender value of the policy at the time it was surrendered should be prorated over the period in which it was in force and $187.20 apportioned to 1944 as a reduction of the premium for that year. Taking up first the petitioner's contention that the premium paid by his employer was $684.45 rather than $777, we believe that only the net amount of the premium, or $684.45, is includible in the petitioner's income. The respondent's regulations support this conclusion. Regulations 111, section 29.22(a)-12, reads in part as follows: "Amounts received as a return *354 of premiums paid under life insurance, endowment, or annuity contracts, and the so-called 'dividends' of a mutual insurance company which may be credited against the current premium, are not subject to tax." All that was paid by his employer for the petitioner's benefit was $684.45. The so-called "dividends" constituted a reduction of the payment necessary for the desired protection. Penn Mutual Life Insurance Co. v. Lederer, 252 U.S. 523; Mutual Benefit Life Insurance Co. v. Herold, 198 Fed. 199, aff'd, 201 Fed. 918, certiorari denied, 231 U.S. 755. In addition, no benefit was derived by the petitioner from the application of the "dividends" against the premium. Any benefit derived by the reduction of the premium payment was derived by the Badger Company, which was the party liable for the payment. The contention of the petitioner that the cash surrender value of the policy at the time of its surrender should be prorated over the actual period in which it was in force and $187.20 apportioned to 1944 as a reduction of the premium for that year, however, must be denied. Not only was it not known in 1944 what the life of the policy *355 would be, i.e., whether it would become a matured policy by operation of the death of the insured or whether it would be surrendered, but the parties have expressly stipulated that no part of the cash surrender value of the policy "was established during the calendar year 1944, or prior thereto." Since the policy had no cash surrender value during 1944, according to the stipulation of the parties, no part of the cash surrender value which was paid to the Badger Company by the insurer in 1946, at the time the policy was surrendered, is applicable to reduce the premium for 1944. It is unnecessary to go further under this issue, and we do not decide the broad question of whether it would be correct to reduce, in any event, the amount of the premium for which the petitioner is taxable in 1944, because of the surrender in a later year of the policy for its then cash surrender value. It is held that the net premium of $684.45 paid by his employer for the year 1944 is includible in the petitioner's income for 1944. The amount of the deficiency shall be increased under a Rule 50 recomputation. See: C. Francis Weeks, 16 T.C. No. 33 (promulgated Jan. 31, 1951). Decision will *356 be entered under Rule 50. Footnotes
1. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere fleeting intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.↩
2. See, also, Ray E. McCurdy, Docket No. 17833, decided under an unreported Memorandum Findings of Fact and Opinion which was entered on Nov. 24, 1950. [9 TCM 1073↩].