C. FRANCIS WEEKS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20903. Promulgated January 31, 1951.

*Oliver A. Wyman, Esq.*, for the petitioner.
*Joseph Landis, Esq.*, for the respondent.

252

HARRON, *Judge:* The primary issue in this proceeding is whether or not the petitioner was a bona fide resident of Iran during the entire year 1944. If, as the petitioner alleges, he was a bona fide resident of Iran throughout 1944, he is exempt from income tax on income which he earned without the United States during that year under section 116 (a) of the Internal Revenue Code. However, if the contention of the respondent is correct and the petitioner was not a bona fide resident of Iran, he is taxable on such income.

In prior cases, we have discussed the legislative history of section 116 (a), as amended by section 148 (a) of thé Revenue Act of 1942, and have said that "prior to the 1942 Act, section 116 (a) permitted foreign income to be tax-free where the taxpayer was merely a 'bona fide non-resident' of the United States for more than six months of the taxable year; that the purpose of the 1942 amendment was to narrow the exemption; that when the 1942 legislation was pending in the House of Representatives, the exemption was completely eliminated, but that it was restored in a restricted form by the Senate; and that the purpose of the provision was explained by Senator George, the Chairman of the Senate Finance Committee, as follows" (Hearings before Senate Finance Committee on H. R. 7378, 77th Cong., 2d Sess., Vol. 1, p. 743) :

\* \* \* I think it is recognized that the complete elimination of section 116 (a) was not really intended, that it was not the primary purpose in the case of

the bona fide, nonresident American citizen who established a home and maintains his establishment and is taking on corresponding obligations of the home in any foreign country, but there is some need for treatment of this section, so that the technicians, American citizens who are merely temporarily away from home could be properly reached and properly dealt with for taxation purposes.

See, also, S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 54–55, 116.

The criteria to be used in determining whether or not a citizen of the United States is a bona fide resident of a foreign country are the same as those which are applicable in determining whether or not an alien is a resident of the United States. *Herman Frederick Baehre*, 15 T. C. 236; *Arthur J. H. Johnson*, 7 T. C. 1040; *Seeley* v. *Commissioner* (CA–2), 186 Fed. (2d) 541, affirming in part and reversing in part 14 T. C. 175; Regulations 111, section 29.116–1. These criteria are listed in Regulations 111, section 29.211–2, and are reprinted in the margin.[1]

The issue presented has been decided by us contrary to the contention of this petitioner in a number of prior reported and unreported decisions which involved American citizens who were absent from the United States on jobs involving the war effort. The question under this issue is controlled by the following: *Downs* v. *Commissioner*, 166 Fed. (2d) 504, certiorari denied, 334 U. S. 832, affirming *Michael Downs*, 7 T. C. 1053, and *J. Gerber Hoofnel*, 7 T. C. 1136; *Carl H. Thorsell*, 13 T. C. 909; *William B. Cruise*, 12 T. C. 1059; *Dudley A. Chapin*, 9 T. C. 142; and *Ralph Love*, 8 T. C. 400.

The question of whether the petitioner was a bona fide resident of Iran throughout 1944, under the provisions of section 116 (a) of the Code as amended, is one of fact. The determination of the issue in each proceeding must be determined by reference to the particular facts present in a proceeding. See: *Audio Gray Harvey*, 10 T. C. 183; *Charles F. Bouldin*, 8 T. C. 959; cf. 1 Beale, Conflict of Laws 109 (1935). We think the facts in this proceeding fall within the ambit of the decisions typified by the *Downs* case and that a similar result should be reached. In this proceeding the petitioner was sent to Iran in order to perform technical services of an engineering nature in connection with a war emergency project involving construction of petro-

---

[1] An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

leum refineries. His intention was to remain in Iran only as long as was required to construct the refineries. He had no intention of becoming a permanent resident of that country. At the time that the petitioner entered into the contract for employment in Iran, and during his stay in that country, he was a married man with a family which consisted of his wife and two children. When he departed, he left his family in Methuen, Massachusetts, and his two children attended school there. It was the intention of the petitioner to return to Methuen upon the completion of his work in Iran. His contract of employment provided that his employer should furnish transportation from his home in the United States to Iran and then back to his home upon completion of his services abroad. During the time that the petitioner was employed by the Badger Company in 1944, the company issued checks for his salary less advances he had drawn, which were payable to him and/or his wife, and mailed them to his wife in Methuen.

From the time that the petitioner arrived in Iran in June 1942, until he left in 1945, his room and board were provided by his employer. Room and board were not otherwise available to civilians in Iran during this period. Although the petitioner belonged to a church and a gymkhana club in Iran, these facts alone, especially in the absence of any other indication of the petitioner's participation in the social life of the community, are not indicative that the petitioner was a bona fide resident of Iran. At all times petitioner's intention to return to the United States was fixed and definite, except as to time. His contract of employment provided that it could be terminated at any time without cause at the option of his employer. Upon the completion of his work in Iran, the petitioner returned to his family in the United States.

From our examination of the facts in this proceeding, we are convinced that the petitioner was not a bona fide resident of Iran during the entire taxable year 1944. In the cases relied upon by the petitioner, the showing that the taxpayer had made his home in the country involved and had identified himself in some degree with the customs and activities of that country was much stronger than is indicated by the evidence in this proceeding. We think rather that the facts present here bring the proceeding more closely within the line of decisions exemplified by the *Downs* and *Johnson* cases, *supra*.

It is held that the petitioner was not a bona fide resident of Iran during the entire taxable year 1944.

The remaining issue for decision is whether $757.48 or $861 is includible in petitioner's income by reason of the payment by his employer of the premium on a policy of insurance on the petitioner's life. Pursuant to the contract of employment, the Badger Company pro-

vided insurance on the life of the petitioner during 1944 which was made payable to a beneficiary designated by the petitioner. The gross amount of the premium was $861. This was reduced by the credit of so-called "dividends" to a net premium of $757.48, and the latter amount was paid by the company.

The petitioner now agrees that the premium paid by his employer constitutes additional income to him. See *Commissioner* v. *Bonwit*, 87 Fed. (2d) 764, certiorari denied, 302 U. S. 694; *Yuengling* v. *Commissioner*, 69 Fed. (2d) 971; *G. M. Adams*, 18 B. T. A. 381. However, the petitioner contends that the amount of the premium paid by his employer was only $757.48 and not $861 as alleged by the respondent, and, further, that the cash surrender value of the policy at the time it was surrendered should be prorated over the period in which it was in force and $219.60 apportioned to 1944 as a reduction of the premium for that year.

Taking up first the petitioner's contention that the premium paid by his employer was $757.48 rather than $861, we believe that only the net amount of the premium, or $757.48, is includible in the petitioner's income. The respondent's regulations support this conclusion. Regulations 111, section 29.22 (a)–12, reads in part as follows:

Amounts received as a return of premiums paid under life insurance, endowment, or annuity contracts, and the so-called "dividends" of a mutual insurance company which may be credited against the current premium, are not subject to tax.

All that was paid by his employer for the petitioner's benefit was $757.58. The so-called "dividends" constituted a reduction of the payment necessary for the desired protection. *Penn Mutual Life Insurance Co.* v. *Lederer*, 252 U. S. 523; *Mutual Benefit Life Insurance Co.* v. *Herold*, 198 Fed. 199, affd., 201 Fed. 918, certiorari denied, 231 U. S. 755. In addition, no benefit was derived by the petitioner from the application of the "dividends" against the premium. Any benefit derived by the reduction of the premium payment was derived by the Badger Company, which was the party liable for the payment.

The contention of the petitioner that the cash surrender value of the policy at the time of its surrender should be prorated over the actual period in which it was in force and $219.60 apportioned to 1944 as a reduction of the premium for that year, however, must be denied. Not only was it not known in 1944 what the life of the policy would be, i. e., whether it would become a matured policy by operation of the death of the insured or whether it would be surrendered, but the parties have expressly stipulated that no part of the cash surrender value of the policy "was established during the calendar year 1944, or prior thereto." Since the policy had no cash surrender value during 1944, according to the stipulation of the parties, no part of the cash sur-

render value which was paid to the Badger Company by the insurer in 1946, at the time the policy was surrendered, is applicable to reduce the premium for 1944. It is unnecessary to go further under this issue, and we do not decide the broad question of whether it would be correct to reduce, in any event, the amount of the premium for which the petitioner is taxable in 1944, because of the surrender in a later year of the policy for its then cash surrender value.

It is held that the net premium of $757.48 paid by his employer for the year 1944 is includible in the petitioner's income for 1944. The amount of the deficiency shall be increased under a Rule 50 recomputation.

*Decision will be entered under Rule 50.*