## FULLER v. HOFFERBERT.
### No. 11602.

United States Court of Appeals
Sixth Circuit.
May 29, 1953.

H. Vincent E. Mitchell, Cleveland, Ohio, McAfee, Grossman, Taplin, Hanning, Newcomer & Hazlett, Cleveland, Ohio, on brief, for appellant.

Alonzo W. Watson, Washington, D. C., Charles S. Lyon, Ellis N. Slack and Helen Goodner, Washington, D. C., John J. Kane, Jr., Cleveland, Ohio, on brief, for appellee.

Before ALLEN, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Norman C. Fuller brought suit for refund of income tax paid for the year 1944, basing his claim upon Title 26 U.S.C.A. § 116(a) (1) and (3), and § 119(c) (3).[1] He contends that during the taxable year of 1944, he was a bona fide resident of Soviet Russia and that, under the provisions of the statute above mentioned and the Treasury Regulations promulgated thereunder, he was entitled to a refund of the amount of income tax, which he claims was erroneously and illegally assessed and collected from him by the Collector of Internal Revenue.

On a trial in the district court, his claim for refund was denied, and from such judgment, he appeals.

There is no dispute that the salary which appellant received during the year 1944 was, under section 119(c) (3) above mentioned, paid to him for personal services performed without the United States.

The sole issue in the case is whether, within the intendment of the statute and regulations, Fuller was a bona fide resident of Soviet Russia during the taxable year in question.

In determining this issue, it is necessary to consider the circumstances surrounding Fuller's journey to Russia; the services he performed there; and the nature of his stay in that country, as evidence of his intentions as to residence in Russia.

Fuller was an engineer who commenced his employment with the firm of E. B. Badger & Sons Company, of Boston, in 1939. After having been associated with that company in various engineering projects for approximately four years, he was, in the spring of 1943, offered an assignment in Soviet Russia. It appears that the Badger Company, through a lend-lease agreement between the American government and the Soviet Russian government, was

1. Title 26, U.S.C.A. § 116 (1945 Edition), provides:
   "*Exclusions from gross income*
   "In addition to the items specified * * *, the following items shall not be included in gross income and shall be exempt from taxation under this chapter:
   "(a) *Earned income from sources without the United States.*
   "(1) *Foreign resident for entire taxable year.* In the case of an individual citizen of the United States, who establishes to the satisfaction of the Commissioner that he is a bona fide resident of a foreign country or countries during the entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income as defined in paragraph (3); but such individuals shall not be allowed as a deduction from his gross income any deductions properly allocable to or chargeable against amounts excluded from gross income under this subsection. * * *

   "(3) *Definition of earned income.* For the purposes of this subsection, 'earned income' means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. * * *"
   Title 26, U.S.C.A. § 119, provides·
   * * * * * * *
   "(c) *Gross income from sources without United States.* The following items of gross income shall be treated as income from sources without the United States:
   * * * * * * *
   "(3) Compensation for labor or personal services performed without the United States; * * *."

designated as the consulting engineering company in the erection of a number of oil refineries for the Russian government. In carrying out its commitments, the Badger Company proposed to Fuller that he go to Russia for an indefinite stay as one of its engineers in charge of supervising the engineering services in constructing and placing in operation the new refineries. At that time, the Badger Company informed Fuller that there were at least four refining units that it had already contracted for, with a number of future units being contemplated. Fuller was, at that time, a young man twenty-seven years old, married, and had a home in Toledo, Ohio. The proposal of the Badger Company to send him to Russia in the midst of the war appealed to him for a number of reasons. There was the chance to better his situation, financially, because of the higher salary offered. There was also the challenge to him as an engineer to engage in carrying out large projects in a great undeveloped country; the opportunity for long term employment; the reputation and prestige that would result to him in his profession from having had such experiences and service; and the spirit of adventure, which probably exceeded the other considerations.

It was planned by the Badger Company that A. Gilbert Formel, one of Fuller's friends, and at present chief engineer for a construction company in the East, would be associated in the Russian expedition, and would be Fuller's immediate superior. Both Formel and Fuller were specialists and experts in the Houdry Catalytic Cracking Process, and Fuller's title was Houdry case engineer. During the spring of 1943, Fuller, who was then working for the Badger Company at Marcus Hook, Pennsylvania, on his trips home to Toledo, had stopped off on several occasions at Sandusky, Ohio, where Mr. Formel was working, to talk over the possibilities of the Russian assignment. They had discussed Russia with a couple of engineers who had already been in that country, and, as a result, were enthusiastic about the prospects for an engineer in that part of the world, and thought along the same lines with regard to its being an opportunity of great promise for them, professionally and financially. At that time, the relations between the American government and the Russian government were very friendly.

From June 1943 until late in the autumn, Fuller and Formel were in New York making arrangements for visas, passports, inoculations, and similar matters, and in November 1943, they left for Russia. Fuller's route lay through the Gulf of Mexico, Central and South America, Africa, The Sudan, Egypt, Persia, Stalingrad, and Moscow, where he arrived about the middle of December, 1943. The disastrous German defeat at Stalingrad had occurred earlier that year. After registering with the American Embassy, Fuller was sent to the village of Guriev, which, although described throughout the case as a village, contained approximately 55,000 inhabitants. Guriev is 1,500 miles distant from Moscow and is located at the mouth of the Ural River on the northern shore of the Caspian Sea. A place of extremes of temperature, ranging from 140° Fahrenheit in the summer to 40° below in the winter, and of primitive living conditions, it was a test for the adventurous.

Fuller's work as an engineer in Russia was to assist the Russian engineers and superintendents in whatever manner he could with regard to the engineering project. The design of the materials, as well as their fabrication, was American, and it was the job of Fuller to interpret the plans and specifications; to help the Russians in scheduling their work; and to give them suggestions and recommendations in constructing the refinery.

When Fuller and Formel first arrived in Guriev, they were put up temporarily by the Russian government in a house from which the N. K. V. D., the State Police, had evicted the people whose home it had been. Under the agreement with the Badger Company, the Russian government was obligated to provide satisfactory living quarters and furnishings for Fuller and Formel. But what appeared satisfactory to the Russians fell far below the standards which the Americans expected, and it required continual demands and arguments on their part to secure the quarters to which they

felt they were entitled. After several weeks of such repeated discussions and arguments, the Russians agreed to construct, and did construct, according to the plans and under the supervision of Fuller and Formel, three cottages for the use of the American engineers and for the storage of their materials and equipment. Each cottage was about 50 feet wide by 100 feet long, with cavity brick walls with dirt insulation, wood pole joists, and wooden roof with roofing paper and tar on top. The cottages were substantially built and were divided into two parts, with one apartment in front and one in the rear, each apartment having a living room, bedroom, bathroom and toilet, and kitchen. They were heated by means of a hot water boiler situated in a building which was erected in the rear of the three cottages. Each cottage had hot water radiator heat from this central heating plant. Around an area of about five acres of land upon which the cottages were built was erected a fence.

The Russians were able to supply only a few old benches and chairs to furnish the cottages. Fuller appears to have shown considerable ingenuity in securing lumber from the Russian authorities and making, with work tools, the necessary chairs and benches to furnish the cottages. In addition, he made clothes racks, shelves, lamps, and other conveniences, with the rather unusual result that when Fuller finally left the country, the Russians had commenced to imitate the construction of Fuller's lawn chairs on a production line basis.

During his stay in Russia which lasted approximately twenty months, Fuller, after commencing the study of the Russian language in New York, resumed it in Guriev with the official interpreter for the oil commissariat with which the American engineers were connected, and continued to spend an hour or two a day for a considerable time in the study of the language until he had acquired such a fair working knowledge that he could carry on conversations on ordinary matters related to daily living with the Russians, as well as to engage in a considerable amount of friendly sociable intercourse with them.

Fuller and Formel found that they were largely dependent upon themselves in their games and amusements. The only sports the Russians engaged in were soccer and boxing. Fuller constructed a ping-pong table and basketball boards. In arranging to play horseshoes, he found he could not procure any suitable horseshoes in the locality because of the fact that the Russian ponies are so small that the shoes with which they are shod are only about five inches in diameter. Fuller, accordingly, carved a horseshoe out of wood in the desired size, and from this model, one of the local blacksmiths made a number of horseshoes. Fuller afterward interested the Russians in these various sports and succeeded in teaching and training a number of them to play the American games, including basketball, baseball, and football, until some good players were developed in these sports.

In order to have a variety of food, Fuller planted a garden within the small so-called compound, and secured seed corn, pop corn seed, tomato seed, and whatever other seeds could be found in the locality. In addition to raising these garden products, he also set out a flower garden. Formel, who was a witness, told of Fuller's interest in and supervision of cooking, and of his attempt to make the food more palatable by undertaking to translate into the Russian language an American cook book. He found, however, that there were many words in the cook book for which there was no translation, and ended up by giving numbers to the various American cooking materials, and placing the numbers on the various cans and containers, so that the Russian girl who helped in the cooking could put a spoonful of a certain number into a mixture for a recipe. He even undertook to cook the pastry himself, and made the pies for their dinners.

Fuller and Formel had the use of a jeep, and whenever they had the time, they were free to drive anywhere in the country they desired without permit or supervision, the only restricting factors being sufficient food and gasoline for such journeys. Thus, they had a unique chance to see more of the

people, and the different parts of the country. In studying the situation in Russia, Fuller found that there was a definite atmosphere of fear and oppression among the ordinary workers and the poorer people in Guriev, and that the rank and file of them lived in continual fear of the secret police, and avoided association with foreigners. However, he and Formel became friends with the so-called "higher level" government officials, and often conversed with, and visited the Russian engineers, the members of their staffs, and the military officers, and their families. They were frequently invited to entertainments and dinners by the Russians, and, in turn, invited the various officials and their wives to their place for dinner. They often accepted invitations to the theatre, some of the dramatic companies on tour staying for four months at a time in the village; and they attended traveling circuses, ballets, and other entertainments which seemed to be available most of the time. They were invited to banquets, one, a rather lavish affair in honor of a colonel who, for his work in Guriev, had won the highest award for construction speed and excellence in the entire Soviet Union; and they were afterward invited, with a small, select group of officials, to the home of the colonel for further festivity. During their stay, they became fast friends with a number of Russian officials and their families, as a result of their entering into the life of this remote town on the Caspian Sea. During all of this time, Fuller was studying the Russian people, their language, their land, their economic system, their banking arrangements, and their general conduct of business, and manifested a deep interest not only in his work and environment, but in the adventure of living in a new and strange land.

When Fuller first contemplated going to Russia for the Badger Company, it was his intention to have his wife go with him, but he was told by the company that, while he could not take his wife at that time, if war conditions changed for the better, the company would then see what it could do to make such an arrangement. His marriage had always been happy, and he continued, all during the year of 1944 and until the midsummer of 1945, to try to have his wife allowed to come over. He thought she would like the experience of living a while in Russia, and considered that the house in Guriev would be "an ideal setup" for both of them. In the thought that she might be allowed to come, they sold their house in Toledo in April, 1945. He had his wife take up the matter of securing a visa with the State Department, but they met with one frustration after another. Throughout his whole stay in Russia, Fuller testified, he had intended to remain there indefinitely and to have his wife join him there. Toward the end of his stay, Fuller and his wife decided that he would remain, while his wife resolved, in case she could not join him, to live in America and to follow the necessary training to become a nurse during the war period; and they were reconciled to remaining apart a couple of years longer. Fuller later found out that it was a company policy not to permit employees' wives to go to Russia, and when it appeared that she probably could not join him in Russia, Mrs. Fuller sent him cablegrams on several occasions in which she encouraged him to stay on, for financial and economic reasons. At that time—in the middle, and even in the latter part of 1945—the Badger Company still had a number of engineering projects in Russia at Krasnovodsk, Orsk, and Kuibeshev. As late as June, 1945, Fuller was still uncertain as to whether it would be possible for him to bring his wife to Russia. But, by the time Fuller had seen Badger's chief representative in Russia in Moscow later in the summer of 1945, this official had already arranged with the Embassy for an exit visa for Fuller's return to America. Even then, he planned to seek other engineering work in Iran, and as late as July, 1945, sent his wife a cablegram telling her that his work in Russia was finished, and that travel arrangements were being made for his return, although that was not his decision. In the cablegram, he also told her that he was considering future work in Russia in employment other than with the Badger Company, or in Sumatra. Fuller testified that during the year 1944, he intended to remain in Russia as long as the Badger Company had

work for him to do, and that he definitely considered that such work would last through the year 1944, which it did, and, in fact, for a much longer period.

Thereafter, Mrs. Fuller, because of the repeated frustrations and separation from her husband, began to suffer from nervousness, and decided, in order to recover, to go to Tucson, Arizona, for some months; and it was because of this circumstance, according to Fuller's testimony, that he decided, during the middle of 1945, that he should come back home to her. He returned to America in October, 1945, after an absence of two years.

Fuller's testimony is substantiated by Formel in all important respects, and, in fact, is not attacked or questioned by the government. Was he, then, a bona fide resident of Russia during the taxable year of 1944, within the intendment of the statute exempting him from payment of income tax during that period? In this regard, we proceed to consider what is residence, and what is "bona fide residence," within the meaning of the statute.

Because "domicile" and "residence" are usually in the same place, they are frequently used as if they had the same meaning. "Domicile," however, means living in a locality with intent to make it a fixed and permanent home, while "residence" simply requires bodily presence as an inhabitant in a given place. Commissioner of Internal Revenue v. Swent, 4 Cir., 155 F.2d 513.

In the case before us, the income tax regulations governing the interpretation of section 116, the principal provision of the statute with which we are concerned, set forth that in order to determine who is a bona fide resident of a foreign country, reference should be made to Treasury Regulation 111, Sections 29.211–2 through 29.211–5, relating to what constitutes residence or non-residence in the United States of America by an alien individual. Thus, the test of an American's residence in a foreign country for the purpose of exempting from tax, income derived from his economic pursuits while in such country as a resident, is the test of residence applied to an alien who comes to the United States for a business purpose. That test is set forth in Section 29.211–2, as follows: "An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned."

In Swenson v. Thomas, 5 Cir., 164 F.2d 783, 784, the court had occasion to comment upon the foregoing regulation, and observed: "It excludes 'a mere transient or sojourner', and correctly. A transient means literally 'one going across', or passing through. 'Sojourner' is built around the French word 'jour', meaning a day, and signifies a mere temporary presence or visit." In the Swenson case, the court quoted the regulation, substituting in place of "the United States", the foreign country in which the taxpayer was a resident during the period in controversy. Following this clarifying method in the instant case, it could be said that the regulation provides: "If the taxpayer lives in Russia and has no definite intention as to his stay, he is a resident. One who comes to Russia *for a definite purpose which in its nature may be promptly accomplished* is a transient; but *if his purpose is of such a nature* that an extended stay *may* be necessary for its accomplishment, and, to that end, the taxpayer makes his home temporarily in Russia, he becomes a resident there, though it be his intention at all times to return to

his domicile in the United States when the purpose for which he came has been consummated or abandoned."

■ When it is considered that it required Fuller several months to prepare for the expedition to Russia; that the contract he entered into with the Badger Company provided that the term of his employment would be indefinite; that it was represented to him that the company had contracted for engineering service to be rendered for the erection of four refineries, with several more in contemplation, which would require, and did require engineering services for more than two years; that the service in Russia resulted in greatly increased salary for him, as well as prestige in his profession; that he made efforts to have his wife allowed to go with him and was still planning, after a year and a half of residence in Russia, to have her join him; that he helped to supervise the building of substantial houses for his use during his service in Guriev; that he entered into the life and activities of the community, learning the language, forming friendships, undertaking a serious study of the institutions of the country, and identifying himself with the daily life of the people; that he intended to remain in Russia even longer than his term of service, and thereafter to work as an engineer in Iran or Sumatra— all of these circumstances, which have been set forth in detail make it clear that there was no doubt that his work was of such a nature as to require service in Russia for an indefinite period, and, at least, throughout the year 1944; and that he had intended from the beginning to reside in Russia not only during that period but for a much longer time.

We see little force in the government's argument that, since the taxpayer was happily married, that his wife could not be in Russia with him, and that he was unwilling to remain away from her for any length of time, her presence was an essential element in the establishment of a "true home." In the first place, this statement is contrary to the undisputed evidence as to his unwillingness to remain away from his wife for any length of time. What has been set forth in great detail as to the intentions and views of the husband and wife as to his remaining in Russia is repeated throughout the record without qualification or uncertainty. Moreover, there is nothing in the statute or the regulation that remotely suggests that exemption from income tax depends upon whether a taxpayer has established a "true home" in a foreign country for the taxable year. The regulation refers only to one who "makes his home temporarily" in a foreign country.

In Seeley v. Commissioner, 2 Cir., 186 F.2d 541, 544, where a similar question arose, the court, in holding that a taxpayer was a resident in a foreign country entitled to exemption from income tax, stated that "his purpose, assuming that it had been 'definite,' was not one which was sure to be 'promptly accomplished'; on the contrary it was of 'such a nature that an extended stay may' (might) 'be necessary for its accomplishment, and to that end' he made 'his home temporarily' in London. * * * if his wife had gone along with him there could have been no fair question that together London would have been their 'temporary home.' The only reason why she did not go was 'because of * * * travel restrictions * * *.' Certainly it would not further the general purpose of the statute to induce Americans to take jobs abroad, if those were granted tax exemption who could take their wives, but those were not, who could not. * * * A man who settles down to an indefinitely continued performance of such duties, for the time being at least, has a 'home.'"

■ The fact that, on his application for passport extension, Fuller gave his home address as Toledo, Ohio, and his foreign address as "c/o United States Military Mission, Moscow," is irrelevant and in no way derogates from the fact that he was a bona fide resident of Russia during the taxable year of 1944. Moreover, the government's claim that Fuller's stay in Russia was subject to such legal and contractual restrictions as to preclude any view that he was a bona fide resident of Russia, we find to be without merit. The circumstance that Fuller was subject to the draft and that his deferment was subject to renewal every six months had nothing to do

with his intention as to residence when he went to Russia to help carry out lend-lease agreements with the consent of his government and where his purpose in going was of such a nature that an extended stay might, and, in this case, would be necessary for its accomplishment. In Swenson v. Thomas, supra, the taxpayer had been employed for service in a foreign country for three years but the contract was terminable by either party on thirty days' notice. Yet it was held in that case that the taxpayer had established that he was a bona fide resident of a foreign country during this period and exempt from income tax. The fact that Fuller's passport also was subject to renewal every six months in no way invalidates his claim of bona fide residence during the taxable period, under either the statute or the regulation.

Downs v. Commissioner, 9 Cir., 166 F.2d 504, 505, cited by the government in support of its contention, appears rather, by implication, to sustain appellant. There the court was concerned with the claim for exemption from income tax on the part of a citizen who had served in England under contract with an aircraft corporation. The corporation had a contract with the United States government whereby it agreed to organize, equip, and operate an aircraft depot in Great Britain during the war; and the taxpayer was one of the corporation's workers employed in connection with the project. The contract of employment provided it was to be performed under the regulations and requirements of the corporation, as well as those of the United States government, "and all civil or military laws and regulations in effect from time to time at the place or places of duty * * *." Employees were prohibited from divulging information connected with the war activities, and were to go and come, when and as directed by the employer, and to journey by any method of transportation chosen by the employer. In remarking upon the character of this employment, the court observed: "It will be seen that persons employed under the contract, and who performed services under it, were admitted to the foreign country for specific work directly related to the United States Govern-

ment's war efforts, *and that they were handled, controlled and restricted much the same as military personnel.*" (Emphasis supplied.) The court held that the salaries of such employees were not exempt from income tax under the statute and regulation, and, in discussing the regulation, made this significant declaration: "Section 29.211–2 unquestionably is drawn with the understanding that unless the United States citizen abroad 'makes his home temporarily' in the foreign country, that is, as we see it, identifies himself in some degree with its customs and lives under and within such customs, he is not a resident of the foreign country in which he is staying temporarily." The foregoing could be somewhat expanded, in a general sense, by saying that such a citizen makes his home temporarily in a foreign country, where he enters into the life of the community, takes part in the activities of the people, engages in social intercourse with the citizens, cultivates friendships with them, and identifies himself with their daily lives, their entertainments, their amusements, while intending to continue to live in their country for an indefinite period.

We may here take note of a claim that the legislative history of the tax law discloses support for the government's position in this case. During the course of the hearings on the amendment, the chairman of the committee having the matter under consideration remarked that he might be able to shorten the testimony of one of the witnesses by stating that "the complete elimination of Section 116(a) [the provision with which we are concerned in this case] was not really intended, that it was not the primary purpose in the case of the bona fide, non-resident American citizen who established a home and maintains his establishment and is taking on corresponding obligations of the home in any foreign country, but there is some need for treatment of this section, so that the technicians, American citizens who are merely temporarily away from home could be properly reached and dealt with for taxation purposes." We cannot see, adopting the most favorable view of the government's argument, that the foregoing discloses an inten-

tion that would subject the appellant in this case to income tax during his residence in Russia. In any event, it is not every fragment of a discussion in which a member of Congress participates, informally, with a witness in a hearing before a committee, that is considered a guide or an aid in the construction of a statute. A senator or a representative might often conclude that a remark which he made at the inception of the consideration of a new statute during a hearing was improvident in the light of subsequent reflection. Certainly, such remarks and observations are not aids in construction, and the foregoing quoted statement, made to a witness during a hearing on an amendment, cannot be considered by a court called upon to construe a statute, as having the same dignity and force as the language of the statute itself. We have before us a statute and a regulation which clearly elucidates its meaning.

Under the regulation, Fuller could not be called a mere transient or sojourner in a foreign country during the taxable year of 1944. Under its provisions, he was clearly a bona fide resident of Russia during the taxable year and is exempt from payment of income tax during that period. See Myers v. Commissioner of Internal Revenue, 4 Cir., 180 F.2d 969.

In accordance with the foregoing, the judgment is reversed, the assessment expunged, and the case remanded with directions to enter a judgment for the taxpayer in the amount claimed.