JOSEPH A. MCCURNIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60602. Filed April 29, 1958.

*A. Leon Hebert, Esq.,* and *Sidney A. Champagne, Esq.,* for the petitioner.

*Towner S. Leeper, Esq.,* for the respondent.

Respondent determined a deficiency in petitioner's income tax for the year 1950 in the amount of $1,183.37. At issue is whether petitioner was a bona fide resident of Iran during that year.

### FINDINGS OF FACT.

Petitioner, Joseph A. McCurnin, was born in Bayonne, New Jersey, on June 9, 1906. Throughout his life he has been a citizen of the United States. During most of his life, whenever petitioner has been in the United States, he has made his home in Louisiana.

Petitioner's income tax return for the calendar year 1950 sets forth "Staff Quarters 69/2," Abadan, Iran, as his home address. The return was received by the collector of internal revenue for the district of Louisiana on February 27, 1951. It was received by the collector of internal revenue for the district of Maryland on March 15, 1951, and processed in that office.

Petitioner married his present wife in 1926. She was born in Clinton, Louisiana, and is a citizen of the United States. They have four children, two sons and two daughters. In December 1957 the approximate ages of the sons were 30 and 23 years, and the approximate ages of the daughters were 28 and 19 years. On his income tax return for 1950 petitioner claimed both sons and his younger daughter as dependents. During 1950 the older son was attending college.

In 1940 petitioner was recruited in Baton Rouge, Louisiana, by the United States Corps of Engineers for civilian employment in South America. He was employed as a materials inspector, and stayed in South America for 5 or 6 months before returning to the United States.

The next time petitioner was employed for work abroad was in 1949. In that year he was contacted by the Foster-Wheeler Corporation (hereinafter referred to as the corporation) which offered

him a position as brick mason in connection with certain construction projects in Iran. This position was supervisory in nature, and was open to petitioner if he would agree to go to Iran on "single status," that is, without his wife.

Petitioner communicated with the corporation and attempted to elicit from it an estimate of the time that. the projects would require. He thought they could be completed in 1 year. The corporation, however, refused to estimate the job's duration.

Before accepting the position petitioner discussed it with his wife. They did not contemplate her going to Iran. They considered such factors as the prestige that they believed would accrue to petitioner as a result of employment with the Foster-Wheeler Corporation, the unsteadiness of construction work in the United States on account of weather conditions, and the high salary offered petitioner by the corporation. In the light of these factors petitioner accepted the corporation's offer.

Petitioner signed a contract of employment with the corporation, the relevant provisions of which follow:

2. Employee is hereby employed by the Company in the State of New Jersey, USA, for an indefinite period beginning April–1949 for service with the Company in Abadan, Iran, to perform such duties and for such hours of work as may be assigned to him during the term of his employment provided, however, that this employment is at will only and may be summarily terminated at any time with or without cause and with or without notice; and in the event of such termination, the Company's obligations and responsibilities shall be limited to the obligations expressly provided for herein.

3. In consideration of the Employee's services during the period of employment under the terms of this Agreement, the Company will pay to the Employee salary compensation in U. S. dollars deposited to the credit of the Employee in any bank or to any individual to be designated by the Employee, in the United States as follows:

A. $107.80 U. S. Dollars per week or any part thereof on a pro-rata daily basis of seven days per week for the period of time beginning on the day the Employee leaves home and ending on the day of debarkation in Abadan, Iran; and when returning home, beginning on the day of embarkation in Iran until the day the Employee arrives at his home.

B. $700.00 U. S. Dollars per calendar month or any part thereof on a pro-rata daily basis of 26 work days per month, beginning from the date of debarkation in Abadan, Iran, until the day of embarkation from Abadan, Iran.

C. Except that in the event the Employee is discharged for cause or voluntarily terminates his employment, all salary compensation shall cease at the time of such discharge or termination.

D. Employee is subject to all applicable U. S. taxes and deductions will be made for Social Security, Income Tax, and any other taxes when required by the United States laws.

E. Upon execution of the assignment form attached hereto, the Company will deposit monthly, or otherwise pay, to the credit of the Employee in any bank or to any individuals in the United States, all monies due 'under this contract. It is further understood that the Company shall not be held

responsible, beyond evidence of payment, for monies deposited to the Employee's account in banks or to individuals as has been directed by the Employee.

4. The Company agrees to furnish transportation and traveling expenses to the Employee as follows:

A. Bus, airplane or railroad transportation, including Pullman, from the Employee's home in the United States to point of embarkation for Abadan, Iran; and when returning to the Employee's home in the United States, from port of debarkation from Abadan to the Employee's home, together with $6.00 per diem subsistence expenses while en route in the United States and during Company authorized travel status periods.

B. Transportation and subsistence from the United States to Abadan, Iran, and return, it being understood and agreed by the Employee that such transportation and subsistence will be furnished to the best of the Company's ability by such means, at such times, and in such manner as circumstances prevalent at the time will permit, and it being further understood that the Employee is willing to accept air transportation.

C. In the event the Employee voluntarily terminates his employment or is discharged by the Company, return transportation and subsistence as provided herein will be furnished by the Company and Employee agrees that he will accept such return transportation as the Company may furnish and leave Abadan immediately when such transportation is available.

5. The Company agrees that, in addition to the aforesaid compensation, transportation and expenses, it will undertake to furnish or arrange with others to furnish to the Employee, without cost, subject to such hazards and other conditions as are beyond the Company's control the following:—

\*        \*        \*        \*        \*        \*        \*

B. Workmen's Compensation insurance subject to the provisions of the N. J. State Workmen's Compensation Act, to be maintained in full force and effect during the entire term of employment under this contract. The Company will arrange that such insurance shall cover injuries received by the Employee while en route to and from Iran, or while engaged on the work in Iran, so far as such coverage is possible under the extra-territorial provisions of the N. J. State statutes and is permitted by international law. It is understood and agreed that the remedies under said Act shall be exclusive and the Company shall not be under any other liability for any illnesses or accidents, including death, sustained by the Employee during the term of his employment.

6. In addition to the aforesaid provisions, the Company will furnish without cost to the Employee the following:—

A. Suitable private living quarters furnished with modern conveniences in the building, including hot and cold water, electric heaters, fans, bed linen, towels and mosquito net.

B. A separate dining room operated especially for the American forces, staffed with cooks and servants; also air-conditioned lounge room, in connection with the dining room, furnished with appropriate furniture, including pool table, ping pong, card tables and dart boards.

C. Sufficient food, without rationing, prepared and served in the aforesaid dining room and supplemented by American food imported from the United States.

D. Transportation at convenient hours between the living quarters and the job and between the job and restaurant at noon.

E. Medical services by qualified physicians and surgeons in a modern hospital equipped with the latest hospital equipment and trained nurses. Such dental and ocular service as may be required shall be paid for by the Employee.

F. Servants for cleaning living quarters. This service does not include laundry, dry cleaning and pressing.

G. The Company will give the Employee $25.00 to reimburse him for special items such as solar glasses and sun helmet, required in the performance of his duties.

H. All expenses reasonably incurred in connection with procuring passport visas, permits, physical examinations, inoculations, vaccinations, and photographs required in pursuance of preparation for the work in Abadan.

I. Any and all tax arising out of the presence of the Employee in Abadan, including income tax required by the Iranian Government, but not including Customs duties.

J. Any and all expense incurred by the Employee while attending the language school now in Abadan, including tuition, books and transportation to and from the school.

K. A number of popular American magazines will be furnished by the Company.

L. The Company agrees to furnish without cost to the Employees sufficient baseball equipment for two complete teams of nine men each. All accessories necessary for participation in sports or games of all kinds other than baseball must be furnished and paid for by the Employee.

7. All individuals employed under this Contract are subject to all the Company's rules and regulations, including those of Anglo-Iranian Oil Company in Abadan, to all the laws and regulations of the Government of Iran, e. g. police, exchange control and customs regulations and to the terms and regulations expressed herein.

\*　　\*　　\*　　\*　　\*　　\*　　\*

9. Recreational facilities will be made available to the Employee through membership in clubs and social societies now existant [sic] in Abadan. Such membership, subject to rules of the club, shall be at the choice and expense of the Employee, including monthly dues and any normal charges made for participation in games.

Petitioner applied for a United States passport on April 25, 1949. On his application he stated that his permanent residence was at 19 Magnolia Road, Maplewood, Louisiana; that he intended to leave the United States during the early part of May 1949; that he intended to visit Iran on "commercial business," and that he intended to return to the United States within 18 months. His passport was issued on May 2, 1949.

The corporation obtained an Iranian visa for petitioner, which was dated May 20, 1949. It was stated to be "For one month," and further therein it was characterized as "Valid for 3 months."

Petitioner's passport was inspected in Iran by officials of that country in connection with his arrival there on May 30, 1949.

After his arrival in Iran the corporation obtained a residence permit for petitioner from the Iranian Government. This permit was dated July 12, 1949, and was valid for 1 year. The following year it was renewed for an additional year.

Petitioner registered with the United States Vice Consul in Tehran, Iran, on August 9, 1949. On the registration form he stated that he

was then residing at 19 Magnolia Road, Maplewood, Louisiana, and that his legal residence was at that address. He stated that he intended to return to the United States to reside permanently within 2 years.

While in Iran petitioner lived in barracks occupied exclusively by employees from the United States. Part of his salary was paid to him in Iran and the remainder was paid at his direction in the United States. Iranian taxes levied on petitioner were paid on his behalf by the corporation.

Petitioner, while in Iran, belonged to a social club the facilities of which were also used by Iranians "in the upper brackets." Among the activities available at the club were dancing, swimming, and golf. The club also operated bars and "pool rooms."

The corporation fulfilled the obligations imposed on it by the above-quoted provisions of the employment contract.

Petitioner did not attend a school provided by the corporation for the study of the Iranian language.

At the beginning of 1950 petitioner signed a form which authorized the corporation to cease withholding tax from his salary. The form was furnished petitioner by the corporation.

While in Iran petitioner learned that the corporation was contemplating additional construction projects in that country. He made up his mind that he would not work on the new projects unless he was allowed to bring his wife to Iran. Petitioner did not communicate this decision to his wife.

Increasing political unrest in Iran resulted in rioting in April 1951. The rioting began on a Thursday and on the following Saturday petitioner left that country. He returned to the United States on April 17, 1951.

From the time of his return in 1951 until December 1952 petitioner worked for various employers in Baton Rouge, Louisiana. He was not continuously employed during this period. When employed, he did "outside" work.

Shortly after his return to the United States in 1951 petitioner was offered the opportunity to work in South America. He did not accept the offer because the salary was unsatisfactory and he would not have been allowed to take his family with him.

In December 1952 petitioner went to Saudi Arabia where he was employed until September 1953. In this connection he had his United States passport renewed on December 15, 1952. This renewal validated the passport until May 1, 1953.

Petitioner registered with the United States Consul General in Dhahran, Saudi Arabia, on June 2, 1953. On his registration form he stated that he was then residing in Abqaiq, Saudi Arabia; that it

was his legal residence, and that he intended to return to the United States to reside permanently within 1 year.

Petitioner returned to the United States from Saudi Arabia on September 10, 1953. He was hired next by the Foster-Wheeler Corporation for employment in South America. He left for Colombia on September 28, 1953. He remained there until March 18, 1955, when he returned to the United States.

Petitioner did not leave the United States again until June 1956 when he went to the Union of South Africa in the employ of the Kellogg Corporation. On June 10, 1956, he filed an application and paid the necessary fee to renew a United States passport issued on June 2, 1953. On this application he stated that he proposed to stay abroad approximately 3 months. He worked in the Union of South Africa for 6 months before returning to the United States.

In December 1956 petitioner refused an offer of employment in France because his wife would not have been allowed to accompany him.

Petitioner has been informed by doctors that he now has a heart condition which precludes employment abroad.

In December 1957, at the time this case was heard, petitioner was employed as a building inspector in Baton Rouge, Louisiana.

Petitioner was not a bona fide resident of Iran during 1950.

OPINION.

RAUM, *Judge:* Whether a taxpayer is a "bona fide resident of a foreign country" within the meaning of section 116 (a) of the 1939 Code is primarily a question of fact, and it is therefore understandably difficult to reconcile all of the decisions in this field. The principles to be applied are in general the same as those which govern the determination of what constitutes residence in the United States in the case of an alien individual. See Regs. 111, secs. 29.116–1, 29.211–2 *et seq.*

The mere fact that the taxpayer's domicile is in the United States does not prevent him from becoming a bona fide resident abroad. *Swenson* v. *Thomas*, 164 F. 2d 783 (C. A. 5). Nevertheless, there must appear an intention to establish a residence in the foreign country. And in determining whether such a residence has been established an appraisal of all the facts is required. As was said in *Lois Kaiser Stierhout*, 24 T. C. 483, 487:

Many small facets of the taxpayer's mode of living abroad are examined to help in the determination of his intention. Such items as the degree of social contact with the natives, the facility in language, the presence of family, the establishment of a home, are all important indicia of intention to establish a residence.

Such an examination of the facts in this case leads us to the conclusion that petitioner did not become a bona fide resident of Iran.

Although petitioner originally anticipated an absence of 1 year when he left the United States, his contract of employment could be terminated by either party without cause, and, if terminated, he was required to leave Iran immediately. While in Iran he lived with other American employees in barracks provided by the employer. He dined with other Americans in a hall operated exclusively for them; some of the food was imported from the United States. He made little attempt to learn the local language in spite of the fact that his employer operated a school in which it was taught. Petitioner received only part of his salary in Iran and had the remainder of it paid in the United States. His wife and children, to whom he seemed to be devoted, remained in the United States and did not contemplate joining him; nor did it appear he could have obtained facilities for them in Iran, notwithstanding that certain other employees or officers of the corporation were permitted to have their families with them. His degree of contact with the Iranians is vague on this record. While it appears that a club membership was made "available" to him by his employer, it is not at all clear from the evidence to what extent this club was used by Iranians or to what extent such "membership" meant social contact between petitioner and Iranians. Moreover, his legal right to remain in Iran was governed in the first instance by a visa with, at most, a 3-month limit, and then by a residence permit, dated July 12, 1949, which was valid for only 1 year, and which was subsequently renewed for an additional year.

We are satisfied that petitioner has failed to establish on this record that he was a bona fide resident of Iran within the meaning of section 116 (a). Like results in analogous cases may be found in *Jones* v. *Kyle*, 190 F. 2d 353 (C. A. 10), certiorari denied 342 U. S. 886; *Downs* v. *Commissioner*, 166 F. 2d 504 (C. A. 9), affirming 7 T. C. 1053 and 7 T. C. 1136; *Ernest Rudolf Hertig*, 19 T. C. 109; *C. Francis Weeks*, 16 T. C. 248; *Carl H. Thorsell*, 13 T. C. 909.

There is very little in the record tending to establish a sufficiently strong link to Iran to justify the conclusion that petitioner had become a bona fide resident of that country. The fact that Iranian taxes were paid on his behalf by his employer is not of great significance in the circumstances of this case. Petitioner appeared to know very little about this, and it is hardly any persuasive indication of his intention to establish a residence in Iran. See *Ernest Rudolf Hertig*, 19 T. C. 109, 114. Furthermore, the temporary character of his presence in Iran is underscored by the time limit in his visa and so-called residence permit. In this connection, section 29.211–2 of Regulations 111, relating to aliens in the United States, provides:

An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

This serves to distinguish *Swenson* v. *Thomas*, 164 F. 2d 783 (C. A. 5), where the taxpayer was present in the foreign country on an indefinite stay, apparently without restriction, that lasted about 4 years, and where, unlike the present case, the taxpayer had not left behind a wife and children in his home in the United States. Nor is *Fuller* v. *Hofferbert*, 204 F. 2d 592 (C. A. 6), controlling here, for in that case there was considerable evidence of extensive integration with the life of the foreign country to such an extent that a strong inference arose as to the taxpayer's intention to make his residence in that country during the period involved. Finally, this is not a case like *Leonard Larsen*, 23 T. C. 599, where we were able to conclude (p. 604) that the taxpayer "had determined to make a career of foreign employment." The record herein does not justify such a finding.

*Decision will be entered under Rule 50.*